## DE FOREST RADIO TELEPHONE & TELEGRAPH CO. v. RADIO CORPORATION OF AMERICA.

Circuit Court of Appeals, Third Circuit.
June 27, 1927.

No. 3462.

1. Patents ⚖⟹213—Agreement for manufacture, use and sale of inventions of patent held license, rather than assignment of patent in part, and scope was restricted by agreement.

Agreement under which plaintiff granted license to another to make, use, and sell inven-

---

tions of patent, held not assignment of patent in part, but license, though it included grant of all transferable rights of plaintiff of any kind and nature whatsoever in said inventions, except rights previously granted and right reserved, and, being a license, its scope was restricted by other terms of agreement.

2. Patents ⚖⟹257—Buyer of patented article made and sold under valid license may resell, without infringing.

Where patented article was made and sold under valid license, product passed from under patent monopoly, and buyer could resell it without infringing.

3. Patents ⚖⟹211(3)—One of companies agreeing to use of each other's patents held estopped to deny that sublicensee of the other was without license to purchase and sell patented device.

Where company, after acquiring right to use and grant licenses to use particular patent, entered into agreement with another company whereby each acquired rights to use patents of the other, and with the other's consent to grant sublicenses, second company having given such consent to defendant sublicensee and received consideration, and one granting licenses to first company held estopped from asserting that defendant was without license to purchase and sell invention of patent manufactured by first company.

4. Patents ⚖⟹210—Written agreements and course of dealing thereunder held to establish implied license to sell patented product.

Where company, after acquiring right to use and to grant licenses to use particular patent, entered into agreement with another company whereby each acquired rights to use patents of the other, and with the other's consent to grant sublicenses, and on the same day joined in quadrupartite agreement whereby rights acquired by it were extended to defendant, defendant held to have implied license to sell patented articles manufactured by its licensor and by manufacturing company and its controlled company whose authority to manufacture was approved by subsequent agreement.

Appeal from the District Court of the United States for the District of Delaware; Hugh M. Morris, Judge.

Infringement suit by the De Forest Radio Telephone & Telegraph Company against the Radio Corporation of America. From a decree dismissing the bill (9 F.[2d] 150), plaintiff appeals. Affirmed.

See, also, 3 F.(2d) 847, 4 F.(2d) 134.

Thomas G. Haight, of Jersey City, N. J., Samuel E. Darby, Jr., of New York City, and E. Ennalls Berl, of Wilmington, Del., for appellant.

John W. Davis, James J. Cosgrove, and James M. Nicely, all of New York City, and William G. Mahaffy, of Wilmington, Del., for appellee.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

WOOLLEY, Circuit Judge. This suit is for infringement of Letters Patent No. 879,-532 issued in 1908 to the inventor's assignee and, in 1914, acquired by the plaintiff through mesne assignments. Suit was brought in 1924, shortly before the patent expired. The trial court dismissed the bill and the plaintiff took this appeal.

As the validity of the patent is not questioned, the one issue is infringement. The defendant admits that it had sold the invention of the patent in large numbers, but defends under a license to sell the invention, and under a claim that the manufacturers from whom it procured the product were licensed to make it, and under a further claim that, irrespective of whether the manufacturers had licenses to make, its license to sell authorized and protected its sales. The issue of infringement, therefore, turns solely on questions of license vaguely implicit in this skeleton recital.

To aid an understanding of this highly involved controversy, and particularly to avail ourselves of our observation that a case well stated is half decided, we refer to the condensed yet sufficient statement of the main facts made by the learned trial court in its opinion. 9 F.(2d) 150.

The ground out of which this controversy grew was the truly great invention of the audion or vacuum tube, made by Lee De Forest, now familiar to all who operate radio apparatus and of which more than 20,000,000 are made and sold annually. As the controversy is confused by much overgrowth, we shall begin at the root and, holding to the trunk, remove the branch issues as we come to them.

The root of the dispute is an arrangement made March 16, 1917 between the plaintiff, the De Forest Company, and the Western Electric Company, whereby the former granted the latter a license (subject to certain rights previously given one Sidney S. Myers and except certain rights reserved to itself) to make, use and sell the inventions of the patent for certain purposes. The license also included a grant of "all transferable rights of said De Forest Company of any kind and nature whatsoever in said inventions," except rights previously granted and rights reserved. The agreement concluded by empowering the Western Company to transfer to others all rights granted it, which included (the plaintiff concedes) the right of a licensee of the Western Company to grant licenses to others. The defendant, the Radio Corporation, tracing its title by license back to this agreement, bases one of its main defenses on the contention that the plaintiff's grant to the Western Company of "all transferable rights" and its grant of the right to "transfer them to others," gave the transferee or licensee of the Western Company not only the right to grant licenses (which concededly it had) but also the right to the licensee of such transferee in turn to grant sub-licenses.

[1] We pause to dispose of this branch of the case by construing the agreement of March 16, 1917. That agreement was not an assignment of the patent, in part; it was a license. It did not purport to assign, transfer or grant to the Western Company "all transferable rights of the said De Forest Company" in the invention or in the patent, thereafter to do with them as it chose; it purported to grant, and did grant, "a *license* * * * for all transferable rights" not reserved or previously granted, and, being a license, its scope is restricted by the other terms of the agreement which include the right of the licensee to license another with the right on his part to grant licenses; and there it stopped.

In this status of rights under the patent, the General Electric Company, on November 20, 1919, entered into a contract with the defendant (which has become known in this litigation as Contract A) whereby it gave the defendant "an exclusive, divisible license to use and sell * * * apparatus purchased from [it] or [from others] with its written consent, * * * so far as the General Company is * * * in condition to supply the same * * * for radio purposes" under all patents or licenses which it then owned or thereafter should acquire. The General Company then had no right under the patent in suit. The defendant maintains, however, that the terms of the agreement of license, though general, were specific enough to cover rights of the General Company under patents it should subsequently acquire. Broadly as to terms, we are of the same opinion; yet, even so, the validity of the General Company's license to the defendant as to after-acquired rights in the patent in suit (A) still depends upon the character of that company's license under the patent, later acquired, and upon its power to grant a sub-license.

The American Telephone & Telegraph Company, having acquired all the rights of Myers and the Western Company in the patent, entered into a cross-license agreement with the General Company on July 1, 1920 (known as contract B) whereby, reserving rights as to certain fields, each granted the other, under "all patents and rights * * * owned or controlled by them," an "exclusive license to make, use, lease and sell all wireless

telephone apparatus for amateur purposes," with a limitation that, without written consent to do otherwise, the manufacture of all the cross-licensed inventions should be carried on in their respective factories. This, it is conceded, included rights acquired by the Telephone Company through the cited mesne assignments to make, use and sell the invention of the patent in suit. The General Company manufactured and sold the invention under this license, and, as it was clearly within the power of the Telephone Company to grant such a license, the plaintiff does not charge that the many million tubes it manufactured and sold were infringements.

But this cross-license agreement (B) further provided that each party might "assign or *grant sub-licenses* * * * provided that in each instance the assent of the other party is first obtained."

While any one might, without license, sell the invention of the patent manufactured and sold by the General Company under license from the Telephone Company, it is clear that this contract B, even though it granted the General Company rights to make and sell the invention, did not validate or make operative the General Company's contract A with the defendant for the *exclusive* right of the latter to sell the invention, for the only things the General Company, acting alone, could do under the license (B) from the Telephone Company, without the consent of that company, were to make, use, lease and sell the invention. Therefore, at that stage, the General Company's anticipatory grant (A) to the defendant of a license *exclusively* to use and sell the product of the patent was without any legal force. At that stage it was, in law, nothing.

On July 1, 1920, the day on which the bipartite contract B was entered into between the Telephone Company and the General Company, a quadrupartite contract C was entered into between the Telephone Company, the General Company, the Western Company and the defendant, the Radio Corporation, wherein, after reciting the cross-license agreement (B), it stated that the General Company desired to extend its rights thereunder to the Radio Corporation, the defendant, pursuant to the provisions of the contract of November 20, 1919 (A); that the Telephone Company desired to extend its rights thereunder to the Western Company pursuant to certain specified agreements; that the defendant, Radio Corporation, and the Western Company desired to obtain such rights; and, lastly, that such rights could be extended only with the assent of both parties to agreement B. Contract C then provided that "the General Company may extend to the Radio Corporation, and the Telephone Company may extend to the Western Company (pursuant to the above-mentioned agreements of November 20, 1919 [A] * * * and otherwise), any of the said rights reserved and acquired by each, respectively, under its present agreement and under said agreement of July 1, 1920 * * *" (B).

It is important here to note two things in this agreement (C)—one, the written assent of both the General Company and the Telephone Company to the exclusive license to use and sell radio apparatus granted the defendant, the Radio Corporation, under A; and the other, that considerations moved between the four parties, the one relevant to this controversy being the grant by the Radio Corporation of certain rights to the Telephone Company in return for the assent of the Telephone Company for rights moving to the Radio Corporation, namely, the right to an exclusive license to use and sell for named purposes the invention of the patent manufactured by the General Company under its license to manufacture granted by the Telephone Company (B).

[2] As we have before intimated, the defendant did not need a license to sell the invention of the patent when manufactured by the General Company under the unchallenged license from the Telephone Company to manufacture and sell (B), on the familiar principle that when the General Company made and sold under a valid license, the product passed from under the patent monopoly, and the vendee, whether the defendant or any one else, could resell it without infringing. But the defendant claims to be something more than a vendee of the General Company and to have rights greater than those of a mere vendee. It claims under contract A, made effective by contract C, "an exclusive, divisible license to * * * sell," which, if valid, would exclude all other possible vendees in marketing the patented product in competition with it. While this is only one of several rights under which the defendant justifies its sales of the patented product, we shall pause and dispose of it as we go along. In doing so we must first return to the contract (B) between the Telephone Company and General Company whereby, in the interchange of patent rights, the former granted the latter an "exclusive license" to make, to use and to sell the invention of the patent, and also the right "to grant sub-licenses" thereunder with the assent of it, the Telephone Company, the granting party. We have held that this right to grant sub-licenses, given the General Company under B,

did not, retroactively, bring to life and into operation the General Company's grant of license to the defendant to use and sell the invention under contract A, for the Telephone Company's assent thereto had not then been given.

Doubtless being of the same opinion, these parties (with two others) executed contract C wherein the Telephone Company gave its assent to the General Company to extend its rights to use and sell the invention to the defendant. Just here is the center of this phase of the controversy. The plaintiff says that the General Company, being without right in law to grant sub-licenses, had nothing to extend; that an attempt thus to extend its own patent rights, or any of them, to the defendant was an attempt to grant it a sub-license, which, therefore, was nugatory; that the assent thereto which the Telephone Company gave the General Company (C) was an attempt on its part to aid the General Company in granting a sub-license, a right which the Telephone Company could not confer nor the General Company exercise with or without the Telephone Company's assent; that, moreover, when the Telephone Company granted the General Company an exclusive license to make, use and sell (B), it exhausted its power with respect to the patent to grant licenses of any kind to any one.

On the surface these arguments are persuasive; and they remain so until one gets inside the transactions and sees precisely what the parties intended and attempted and what were their powers in respect thereto.

The Telephone Company and the General Company, by contract B, established a status in respect to the patent which neither, acting alone, could disturb. This included a valid exclusive license to the General Company to make, use and sell, and also a grant, valid or invalid, of a right on the part of the latter to grant sub-licenses with the assent of the former. In legal effect, all right to make, use and sell passed out of the Telephone Company and into the General Company, not to be disturbed except by the act of the General Company itself and the exercise of the power of assent which the Telephone Company had reserved (B). With that situation neither was satisfied. Both wanted something more, or something different; and also the Western Company and the defendant, the Radio Corporation, wanted something more. Each of the four parties had something which some one of the others did not have, yet wanted; and each was willing to give up something it had for something the others had and were willing to part with. So they entered into the quadrupartite contract (C) whereby the General Company engaged to extend to the Radio Corporation, the defendant, that part of its exclusive license which related to the use and sale of the invention of the patent. But it could not do that unless the Telephone Company approved by exercising its reserved power of assent to use and sale by one other than the General Company. Also, the Telephone Company wanted something from the Radio Corporation, the defendant, and demanded it as a consideration for its assent. The Radio Corporation gave the consideration and the Telephone Company got it and has retained it.

[3] What was the nature of the assent as to a change of rights reserved by the Telephone Company? Admittedly, in the game as it was being played by the four parties, the Telephone Company's reserved power to assent, or not to assent, to any change in the license to the General Company (B) was something that operated as a check to all moves by the other players. Practically, it was a very real thing. In law, it was a reserved power to be exercised at will. In fact, it was a power to control the making, use and sale of the invention of the patent either by holding them in the General Company, or, on that company's voluntary surrender of the license, in whole or in part, by extending or granting to another the whole of it, or, as here, a part of it, namely an exclusive license to the defendant to use and sell. The exercise by the Telephone Company (C) of this power (reserved in B) was, in legal effect, as well as in practical effect, the grant of a limited license to the defendant to use and sell by the Telephone Company, the only person capable of granting it. Of course it was not an express license but it was, nevertheless, a license inevitably implied from what the Telephone Company did and from its power to do it. Having done it and having received the consideration for it and thereafter having acquiesced in it and retained the consideration received, the Telephone Company clearly would be estopped from asserting that the defendant was without license or right exclusively to purchase and sell the invention of the patent manufactured by the General Company. Robinson on Patents, §§ 806, 834, 917.

The plaintiff complains that conduct which estops the Telephone Company does not estop it, the owner of the patent, from asserting the invalidity of an implied "exclusive" license to the defendant to use and sell. That might be true if the De Forest Company, the plaintiff, when the owner of the whole patent, had reserved the right to make, use

and sell the invention in the prescribed field, or had not wholly parted with that right, together with the right to grant licenses therefor, which by legal steps found their way to and became vested in the Telephone Company. Having so framed its license to the Western Company with the right on its part to grant a license to the Telephone Company, the plaintiff cannot be heard to complain when, to whom and how that company should exercise rights which it, the plaintiff, had sold and mediately conferred upon another.

[4] Although this precise aspect of the case was not stressed at the hearing for the obvious reason that the defendant's sales of the invention of the patent manufactured by the General Company under its unchallenged license "to manufacture" could not be infringements, we feel that in the orderly consideration of the manifold issues of this case the validity of the defendant's license *exclusively* to sell the invention thus manufactured calls for decision because of its connection with and bearing on the related facts in the issues next to be discussed. Therefore we find that the defendant held an implied and entirely valid exclusive license to sell the invention of the patent when manufactured by the General Company.

The next two issues raise questions whether the defendant had a valid license, express or implied, to sell the product of the patent when manufactured by others than the General Company.

During the year following the execution of contract C there developed an amazing increase in the demand for vacuum tubes for radio purposes. The defendant, the exclusive licensee to sell them, could not meet this demand because the General Company, the exclusive licensee to manufacture them, could not make them fast enough. To meet this situation a fourth contract (E) was evolved. This was a tripartite agreement made June 30, 1921 between the Radio Corporation, the defendant, the General Company and the Westinghouse Electric & Manufacturing Company, the last two companies being referred to collectively as the "manufacturing companies." In this contract, after reciting contract A and other pertinent contracts, the manufacturing companies agreed that their respective licenses be extended to enable the Westinghouse Company and the General Company to manufacture *for the Radio Corporation* under one another's patents and patent rights, and also under patents of the Radio Corporation, to such an extent that the Radio Corporation, the defendant, *might purchase* from the General Company 60 per

cent. and from the Westinghouse Company 40 per cent. of all radio devices covered by their patents and patent rights, which included the right to manufacture the invention of the patent in suit. This proposal carried the General Company's written consent (A) that the defendant might buy and sell tubes manufactured by another. Yet, obviously, to such an arrangement the Telephone Company stood as a positive barrier. Realizing that the General Company, acting alone, could not validly surrender, extend or grant to the Westinghouse Company a part of its exclusive license to manufacture the invention of the patent and that it could do it only with the assent of the Telephone Company under its reserved power to control and direct any modification or disposition of the license it had granted the General Company, the latter company, on June 9, 1921, wrote the Telephone Company inclosing a draft of the proposed contract (E) and asking its assent thereto. With the draft of contract E before it, the Telephone Company, on June 30, 1921, the date of the execution of contract E, in consideration of the right to operate under patents of the Westinghouse Electric & Manufacturing Company, formally gave its assent that that company manufacture the invention of the patent in suit *for sale to the defendant* to the extent named. Its assent is known as H.

A contract of June 30, 1921, between the Telephone Company, the Western Company and the Westinghouse Electric & Manufacturing Company (the latter referred to in the text as the "Westinghouse Company"), called contract I, is important only in that it shows the consideration which the Telephone Company received for its assent and that the Telephone Company affirmed its assent H to the extension to the Westinghouse Company (which in E included its controlled companies) of rights under the Telephone Company's patents and patent rights, as provided in contract E.

On this statement, the only substantial difference in the facts between contracts C and E and H that we have discerned is in the personnel of the parties and in the subjects matter of the licenses. By contract C the General Company surrendered its exclusive license to *sell* the invention of the patent and the Telephone Company under its reserved power (assent) to dispose of any part of the license so surrendered, gave the defendant by implication an exclusive license to sell. By contracts E and H, the General Company surrendered a part of its exclusive license to *manufacture,* and the Telephone Company

under its reserved power (assent) to dispose of any part of the license so surrendered, similarly by implication, gave the Westinghouse Company a limited license to manufacture. The defendant's right to sell a product thus lawfully made and sold follows as a matter of law. In addition to what the law does, the General Company gave its written consent thereto (A and E). The reasoning in respect to the first implied license applies equally, and exactly, to the second. It will be enough to say, without tracing the reasoning on the facts, that we are of opinion that the Westinghouse Electric & Manufacturing Company held a valid implied license to manufacture the invention of the patent to the extent named, which included the right to sell it to the defendant (Walker on Patents [5th Ed.] § 297), and that sales made by the defendant under its implied license to sell the invention so manufactured and so acquired did not constitute infringement of the patent.

But many tubes sold by the defendant were not manufactured by the General Company or in the works of the Westinghouse Electric & Manufacturing Company. They were manufactured by the Westinghouse Lamp Company, a concern whose name does not appear in any of the license agreements. Therefore the plaintiff says that even if the Westinghouse Electric & Manufacturing Company had a license to manufacture, the Westinghouse Lamp Company did not have such a license, and that sales by the defendant of tubes made by that company constituted infringing sales. The decision of this contention turns on the answer to one of two questions: One, a question of fact, whether the Lamp Company had a license to manufacture tubes for the defendant; the other, a question of law (also urged in respect to the transaction E last decided) whether the defendant had a valid license—either express or implied—to sell tubes manufactured by the Lamp Company if that company did not have a license to manufacture them.

This takes us back to contracts E and H. Contract E, we have said, was a tripartite agreement between the defendant, the Radio Corporation, the General Company and the Westinghouse Electric & Manufacturing Company, whereby, we have held, a limited implied license to manufacture (made effective by H) was extended to or granted the last named company. Although these three companies, the sole signatories to the contract, were the only three named, it was made clear by specific provision that they intended, and in fact made, the contract embrace others. Article VIII of contract E reads as follows:

"The terms 'General Company' and 'Westinghouse Company' as used herein relate to and include respectively for the General Company and the Westinghouse Company, all controlled companies, branches, factories, and departments engaged in the manufacture or sale of radio devices. * * *"

Among the "controlled companies" of Westinghouse Electric & Manufacturing Company was, indubitably, the Westinghouse Lamp Company. This is not a summary disposition of an important issue; it is a definite finding of fact at which we have arrived after mature consideration of the practically undisputed evidence on the subject. As the evidence is too great in volume to re-state and analyze in this opinion, it will be enough very briefly to indicate its trend.

Looking upon the Westinghouse Electric & Manufacturing Company as the parent company—for such it was without regard to what followed—that company owned all the stock of the Lamp Company except directors' qualifying shares; four of the directors and three of the officers of the parent company comprised seven of the eight directors of the Lamp Company. The two companies have separate offices and maintain separate staffs of engineers; the staff of the Lamp Company being called upon by the parent company for research work without charge. The Lamp Company is financed by the parent company and its financial policy dictated by it. So, also, is its business policy, for the Lamp Company cannot engage in business on its own initiative or without the approval of the parent company. Generally, the Lamp Company is a branch of the parent company, incorporated for convenience. Actually, it is an instrumentality of that company, organized for the manufacture of particular products. Legally, it is a mere department of the parent company. Pennsylvania Canal Co. v. Brown et al. (C. C. A.) 235 F. 669; Brown et al. v. Pennsylvania Railroad Co., Pennsylvania Railroad Co. v. Brown et al. (C. C. A.) 250 F. 513; In re Watertown Paper Co. (C. C. A.) 169 F. 252; Westinghouse, etc., Co. v. Allis-Chalmers Co. (C. C. A.) 176 F. 362. Specifically, with reference to the matters in hand, the decision that the Lamp Company should make tubes for the defendant was that of the parent company. Its proportion of tubes within the 40 per cent. allotment under contracts E and H was determined by the parent company and the assumption by the Lamp Company of that work was directed by the parent company on orders received by it from the defendant and turned over to the Lamp Company. We have no doubt that within the in-

tent and practice of the parties, as well as within applicable law, the Lamp Company was, and is, one of the "controlled companies" of the Westinghouse Electric & Manufacturing Company.

That being true, the remaining question on this issue is whether the Telephone Company's assent (H) that a license to manufacture tubes for the defendant be granted the Westinghouse Electric & Manufacturing Company included the Lamp Company within the definition of the grantees contained in contract E. When the Telephone Company was asked to give its assent to an extension or grant to the Westinghouse Electric & Manufacturing Company of a limited license to manufacture the invention of the patent, it was, as we have said, handed a draft of the proposed contract E. In that draft the definition of the Westinghouse Electric & Manufacturing Company, as including its controlled companies, was present. In response to that request, of which the draft of contract E was a part, the Telephone Company assented that a license be extended or granted the Westinghouse Electric & Manufacturing Company without specifically naming the Westinghouse Lamp Company. Yet the Telephone Company not only had a draft of contract E before it, but in its assent it made specific reference to that contract. It is quite evident from what had been done and what was intended, and from what the Telephone Company knew had been done and was proposed to be done, that the Telephone Company's assent was to a grant of a license to the grantees named in contract E; that is, to the Westinghouse Electric & Manufacturing Company and its controlled companies, of which the Lamp Company was one. We are therefore of opinion that the Lamp Company also had a limited implied license to manufacture the invention of the patent for the defendant, and that sales made by the defendant under its implied license to sell the invention so manufactured and so acquired were not infringing sales.

On these findings, all other questions, such as, is the title to the patent in the plaintiff; if it is in the plaintiff, whether the title is such as will permit it to sue for infringement without joining the Telephone Company as co-plaintiff; if it is not in the plaintiff, whether the defendant is estopped to question its title; whether the defendant (a licensee to use and sell), if it purchased the invention of the patent from infringing manufacturers, was itself guilty of infringement; and, finally, whether the plaintiff has been guilty of such laches in asserting its rights as to bar it

from the relief it seeks, disappear from the case.

The decree of the District Court is affirmed.