WESTINGHOUSE ELECTRIC & MFG. CO. v. DE FOREST RADIO TELEPHONE & TELEGRAPH CO. and four other cases.

Circuit Court of Appeals, Third Circuit. October 6, 1927.

Nos. 3563, 3624-3627.

1. Patents ⌚106(3)—Plaintiff, alleging interference of patents, has burden of proof (35 USCA § 66).

Plaintiff, in suit under Rev. St. § 4918 (35 USCA § 66 [Comp. St. § 9463]), alleging interference of patents, has burden of showing that contesting patents are interfering patents.

2. Patents ⌚72(1)—Patent cannot anticipate another without identity.

It is impossible for one invention to anticipate another without identity.

3. Patents ⌚328—De Forest, 1,507,016 and 1,507,017, for radio signaling system, held valid on issue of priority.

De Forest patents, Nos. 1,507,016 and 1,-507,017, for radio signaling system, held valid as against claim of priority of invention.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania; J. Whitaker Thompson, Judge.

Appeal from the District Court of the United States for the District of Delaware; Hugh M. Morris, Judge.

Separate suits by the De Forest Radio Telephone & Telegraph Company against the Westinghouse Electric & Manufacturing Company, by the United States of America and another against the De Forest Radio Telephone & Telegraph Company and others, by the United States of America and another against the Westinghouse Electric & Manufacturing Company, Edwin H. Armstrong, the De Forest Radio Telephone & Telegraph Company, and others, and by the United States of America and another against the General Electric Company, Irving Langmuir, the De Forest Radio Telephone & Telegraph Company, and others. From the decrees (13 F.[2d] 1014, 18 F.[2d] 338, 345), defendant in the first case appeals, plaintiffs in the second case appeal, the first two named defendants in the third case appeal, and in the fourth case the first two named defendants appeal. Affirmed.

Drury W. Cooper, Thomas Ewing, H. Frank Wiegand, and Howson & Howson, all of New York City, for appellant Westinghouse Electric & Mfg. Co.

Harry E. Dunham, of Schenectady, N. Y., Ralph B. Evans, of Philadelphia, Pa., and William G. Mahaffy, of Wilmington, Del., for appellant General Electric Co. and another.

Harry E. Knight, Clifton V. Edwards, and Octavius Knight, Sp. Asst. Attys. Gen., for the United States and another.

Samuel E. Darby, Jr., of New York City, Thomas G. Haight, of Jersey City, N. J., and F. B. Bracken and Morgan, Lewis & Bockius, all of Philadelphia, Pa., for appellee De Forest Radio Telephone & Telegraph Co.

William R. Ballard, of New York City, and Ward & Gray, of Wilmington, Del., for appellee American Telephone & Telegraph Co.

Carroll R. Williams, of Philadelphia, Pa., for Federal Telephone Co., amicus curiæ.

Walter H. Pumphrey, of New York City, for A. H. Grebe & Co., amicus curiæ.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

WOOLLEY, Circuit Judge. These cases concern the priority of conception and reduction to practice of a great invention in radio or wireless signalling systems. Though the main issues are purely of fact they are far from simple. This is because of the highly technical character of the still mysterious art out of which they arose and, also, be-

cause of the difficulty the lay mind has in comprehending the invention and discovering its place in a train of scientific facts without a previous knowledge of the relation of those facts one to another and, when brought together in one structure, without a clear notion of how the thing works. Of course we shall not presume to say what radio really is, for no one has told us; and, so far as we can learn from an independent study of text books on the subject, no one knows. Yet the behavior of certain scientific data in the transmission and reception of sounds between widely separated points is known. This opinion will, therefore, be addressed to those who, of their own knowledge of the art in action, can pick up any branch of radio organization at any stage and, without more than an elementary statement of what went just before, can understand the invention in suit and the place it took when it entered the art.

Prior to 1912 it was well known that sounds, as of the voice or a musical instrument, could be transmitted for what then seemed great distances through the medium of electro-magnetic waves created by electrical vibrations. Originating at a sending or broadcasting station, these waves radiate in every direction at a rate of vibration, or at a *frequency*, measured by the number of wave crests which pass a given point per second, amounting sometimes to several million and traveling with a velocity of 186,000 miles a second. When above 20,000 per second they are arbitrarily said to be of *radio* frequency and cannot be heard by the human ear. When waves of this type strike the antennæ of a distant receiving set and impose upon them waves of the same high frequency, it is the function of that apparatus to convert them into waves of lower frequency, or below 20,000 per second, so that they may be audible. When thus converted they are appropriately termed waves of *audio* frequency. Waves of radio frequency are sent out by an alternating current, but before they will transmit sound their frequency must not only be reduced or converted to the audible state but the current must be transformed from an alternating current to a pulsating direct current through which alone sound is carried to the ear.

While the invention in suit relates to apparatus for both the transmission and reception of sound waves, it is used mainly in apparatus for their reception. We shall, for convenience, speak of it only in that aspect.

A receiving set in the early days of this still young art was, and still is, a compli- cated arrangement of electrical parts, the essentials of which (for our purpose) include (1) an aerial, (2) a lead-in wire, (3) a detector, (4) head telephones or receivers, and (5) a ground connection. Further limiting our description of the apparatus to which the invention more directly relates, it will be enough to say that of these several elements we are mainly concerned with the detector. The function of that device—which might more appropriately be termed a rectifier—is to rectify, convert, or filter radio frequency vibrations coming through the receiving aerial into vibrations of audio frequency. The detector in general use in 1912 and 1913 was the vacuum valve, thermionic valve or vacuum tube. It was first conceived by Fleming, an English inventor, and improved by De Forest, a claimed inventor of the invention in suit, and named by him the *audion*. For many years it had been known that a metal filament heated in a vacuum will give off millions of minute particles or negative charges of electricity, called electrons, in much the same fashion as a piece of iron raised to white heat in a blacksmith's forge throws off sparks. Fleming took a vacuum tube with a heated filament and placed near it, but apart from it, a cold metallic plate within the zone of the myriads of electrons emitted by the filament. He called this a glow lamp, or oscillation valve, and discovered that, by a sort of valve action, it would pass electricity better in one direction than in the opposite direction, or, in other words, the valve had the property of rectifying alternating current similar to but very much better than that of the crystal which had previously been used as a detector. By placing the valves in series with a source of radio-frequency oscillations, he found that one-half of each oscillation could be suppressed, and the circuit would then be transversed by a pulsating direct current, and the desired sounds be transmitted through the receivers.

De Forest improved on Fleming's invention by adding a third element in the form of a metallic cage or spiral of wire which he called the *grid*. He discovered that at the same time electrons pass from the filament to the plate some of them could be intercepted by the grid and stored up on it. Electrons thus collected and stored (constituting a negative charge of electricity) are released by a positive charge which, when reversed, restores its negative action and thus assists in rectifying the alternating current. With this preliminary and very elementary statement of what Fleming and De Forest did, it is enough for our purpose to note that the au-

dion, though resembling an incandescent lamp and, like the lamp, being highly exhausted of air or gas, differs from it in its vacuum contents in that it comprises *three* electrodes; (1) a metallic filament which is electrically heated to incandescence through external contact points, (2) a cold metal *plate* placed apart from the filament, having an external contact point (the invention of Fleming), and (3) a cold metallic cage or spiral wire called the *grid,* intermediate the filament and plate and apart from both, having an outside terminal (the invention of De Forest).

The audion, as conceived by Fleming and perfected by De Forest, together with its appropriate electric currents, is now in universal use and is the basis of the modern art of transmitting sounds great distances both by wire and through the air.

We now come to the invention in suit which deals primarily with circuit arrangements in connection with the detector parts we have just described. The standard audion hook-up in 1912 consisted of three circuits: (1) The filament circuit, connected with the filament's two external contact points and supplied with energy by the A battery; (2) the input or grid circuit, one terminal of which was connected with the hot electrode or filament and the other with the grid; and (3) the output, plate or wing circuit, one terminal of which was connected with the filament and the other with the plate, the latter being actuated by the B battery. The input or grid circuit, being coupled with the antennæ, received the incoming waves of radio frequency which the audion then converted into waves of audio frequency in the plate or output circuit, whence the electrical vibrations were carried by a wire connection to a receiver and finally to the human ear in the form of sounds. With this circuit arrangement in mind, the remaining one of many scientific facts which it will be necessary to state is that, although the valve action of the grid was a great improvement over earlier detectors in rectifying alternating currents, the incoming oscillations, after traveling many miles from a broadcasting station and losing power as they proceeded through the air would die down and when they reached the receiving station would be feeble and, in consequence, the efficiency of the system would become limited in area and audibility. Just here, some time in 1912 or 1913, four men in distant parts of the world, it is claimed, made the same discovery that by coupling up the output plate circuit with the input grid circuit (either by physical connections or induction) the weak incoming

radio oscillations could be built up and greatly strengthened—indeed, they could be strengthened several hundred fold—and thus the area of sound transmission be vastly extended and audibility greatly increased. The reason given for this is that by hooking up the output circuit with the input circuit in one of several ways the current of the latter is strengthened by a magnetic flux set up by the former; the operation, wherein the energy of each circuit reacts upon the other, repeats itself a great number of times with cumulative effect until an amplifying alternating current is produced whose frequency can be controlled by varying the electric constants in the assembled circuits. A current of this type causes the discs of the receiver to vibrate more violently and produce louder sounds. Or, stated differently, by feeding back the energy of the output circuit to the input circuit, the latter is regenerated, hence its name of feed-back or regenerative circuit. The arrangement of this circuit and the discovery of its operation involved, coincidentally, another great discovery. This is that the audion when hooked up with the feed-back circuit and supplied with sufficient energy will develop a sustained alternating current, that is, sustained local oscillations of its own. Thus within itself the audion will become a source of electrical power. Though inert in the sense that its parts do not move, it is as complete a source of power as a dynamo or steam engine. When thus extended and put to this use it is called the "oscillating audion."

As the audion is the basis of the modern art of transmitting sound, the feed-back circuit with its oscillating audion—whether one invention or two—made the next great stride toward the perfection of the art. Being therefore an invention of capital importance and having been conceived independently by four men within a brief period of time, a violent controversy as to who first made the invention promptly arose, resulting in a maze of litigation.

This controversy presents more complications than is usual in such cases because of the number of parties involved, the highly technical subject matter in issue and the diversity of decisions rendered by various tribunals as the litigation proceeded. As the decisions in the instant cases will be based in part on the evidence in the other cases, affected or not affected (as may be) by the judgments in those cases, it becomes necessary to trace the litigation in outline from the beginning to the present time.

Four parties are involved; each asserts

a prior claim to the same invention. Irving Langmuir, the first in the Patent Office, filed an application for a patent on October 29, 1913, claiming August 1, 1913, as the date of his invention. Edwin H. Armstrong filed an application on October 29, 1913, for a patent on the feed-back or regenerative circuit and on December 18, 1913, an application for a patent for a use to which that circuit could be put, namely, to make the audion itself a generator of an alternating current, claiming an unnamed date in the fall of 1912, or, certainly, a date not later than January 31, 1913, as the date of his invention or inventions. On March 16, 1914, Alexander Meissner filed an application and claimed April 9, 1913, as his date of invention. Lee De Forest, the last in the Patent Office, filed an application on March 20, 1914, and another on September 23, 1915, claiming August 6, 1912 (the earliest of all), as the date of his invention.

On October 6, 1914, on his application filed October 29, 1913, patent No. 1,113,149 was issued to Edwin H. Armstrong covering ostensibly the circuit known as the feed-back or regenerative circuit to be used in connection with the De Forest audion. No patent has been issued to Armstrong on his application of December 18, 1913, specifically for the use of feed-back as a generator of sustained alternating currents.

Early in 1917 (after Armstrong's patent had issued and while the De Forest, Langmuir and Meissner patent applications and the Armstrong second application were still pending) an interference, numbered 41,225 and known in this litigation as "the two-party interference" involving the applications of De Forest and Langmuir, was declared. Also an interference, numbered 41,224 and known as "the three-party interference" involving the applications of De Forest, Langmuir and Meissner, was declared. The next and last interference, numbered 41,790 and known as "the four-party interference" involving applications of De Forest, Langmuir and Meissner and in addition the then pending application of Armstrong for the use of a feed-back circuit in developing in the audion a sustained alternating current (not the feed-back circuit for which his patent No. 1,113,-149 had been issued), was declared.

In January, 1920, while these several interference proceedings were pending, Armstrong and his assignee, the Westinghouse Electric & Manufacturing Company, brought suit in the District Court of the United States for the Southern District of New York against the De Forest Company (a party in each of the instant actions) for infringement of the Armstrong patent No. 1,-113,149. The District Court accorded Armstrong January 31, 1913, as the date of his invention, a date subsequent to De Forest's claimed date, and, adjudging Armstrong the first and original inventor, held the patent valid, and infringed by certain apparatus manufactured by the De Forest Company. 279 F. 445. On appeal, the Circuit Court of Appeals for the Second Circuit, affirmed the decree of the District Court. 280 F. 584. After the decision of the District Court (which for convenience we shall call the New York court), the first tribunal in the Patent Office, namely, the Examiner of Interferences, in deciding the two-party interference, awarded priority of invention to Langmuir. In the three-party interference his award was also in favor of Langmuir. In the four-party interference, refusing to follow the decision of the New York court, he awarded priority of invention to Meissner. On July 21, 1922, the Board of Examiners-in-Chief, the next tribunal in rank, affirmed the Examiner of Interferences in the two-party and the three-party interferences awarding priority of invention to Langmuir and reversed his decision in the four-party interference by awarding priority of invention to Armstrong, apparently following the decision of the New York court. Thereupon the parties who did not prevail in the three co-pending interference proceedings appealed to the Commissioner of Patents. On March 31, 1923, the First Assistant Commissioner rendered a decision affirming the Board's award of priority of invention of the subject matter of the four-party interference to Armstrong and of the subjects matter of the two-party and three-party interference to Langmuir. All defeated parties (except Meissner in the three party interference) then appealed to the Court of Appeals of the District of Columbia (to which for convenience we shall refer as the Washington court) and on May 5, 1924, that court, entertaining appeals on the three co-pending interferences together and not feeling constrained to follow the decision of the New York court, in one opinion reversed the decision of the First Assistant Commissioner of Patents and awarded priority of invention of the subjects matter of all interferences to De Forest, 54 App. D. C. 391, 298 F. 1006. The Washington court then issued its mandate to the Commissioner of Patents and pursuant thereto De Forest patents Nos. 1,507,016 and 1,507,017 were issued on September 2, 1924.

Between the dates of the Washington de-

cision and the grant of the De Forest patents, namely, on June 14, 1924, the United States of America, assignee of Meissner, instituted suit under R. S. 4915 (35 USCA § 63 [Comp. St. § 9460]), against the other parties to the four-party interference, their assignees and a licensee, to obtain a decree authorizing the issuance of a patent to Meissner for the invention defined in the counts of the interference. This suit was brought in the District Court of the United States for the District of Delaware, to which for brevity we shall refer as the Meissner-Wilmington case. Each defendant set up a counterclaim asserting ownership of the invention by assignments, thus raising the issue of priority of invention.

While the Meissner-Wilmington case was pending, namely, on September 31, 1924, the De Forest Radio Telephone & Telegraph Company (assignee of De Forest patents Nos. 1,507,016 and 1,507,017) instituted suit against the Westinghouse Electric & Manufacturing Company (assignee of Armstrong patent No. 1,113,149) under section 4918, R. S. (35 USCA § 66 [Comp. St. § 9463]), to have the latter patent adjudged invalid. That suit was brought in the District Court of the United States for the Eastern District of Pennsylvania. This we shall call the Philadelphia case. The bill alleged that the contesting patents are interfering patents within the meaning of the cited section, the claims of the respective patents alleged to interfere being:

Armstrong patent No. 1,113,149—claims 1, 2, 3, 6, 8, 9, 12, 14, 15, 16, 17 and 18.

De Forest patent No: 1,507,016—claims 24, 25, 26, 27 and 28. De Forest patent No. 1,507,017—claims 15, 17, 18, 19, 20 and 21.

And finally, on December 5, 1924, Irving Langmuir and General Electric Company, his assignee, instituted suit in the District Court of the United States for the District of Delaware against De Forest, his assignee and licensee, under section 4915, R. S., to obtain a decree for the issuance of a patent to Langmuir for the invention defined in the counts of the interferences, No. 41,225 and 41,224 co-pending with Interference No. 41,790. We shall speak of this case as the Langmuir-Wilmington case.

The record of the Washington case was offered and admitted in evidence in the Philadelphia case and Wilmington cases, to show on what that court rendered its decisions, and the record in the Philadelphia case was stipulated into the Wilmington cases.

The main attack in these three cases was against the claimed priority of invention by De Forest and, except when peculiarly applicable to the claims of Meissner and Langmuir, much of the evidence is the same in each case. Throughout the pendency of these cases in the several named courts and, indeed, up until the present time, the final decree on the affirmed decision of the New York court had not been entered.

On July 27, 1926, the Philadelphia court entered a decree in the Philadelphia case adjudging that the two De Forest patents and the Armstrong patent are interfering patents within the meaning of section 4918, R. S., that De Forest was the first and original inventor of the subject matter of these patents and that the interfering claims of the Armstrong patent are void and should be canceled. That court, not regarding the interlocutory decree in the New York case as res judicata, based its judgment on the controlling effect of the principle of Morgan v. Daniels, 153 U. S. 120, 14 S. Ct. 772, 38 L. Ed. 657, holding that the defendant had failed to sustain the burden of overcoming the decision of the Court of Appeals of the District of Columbia in the manner declared by the principle of that case. (D. C.) 13 F.(2d.) 1014. The Philadelphia case is here on the defendant's appeal (No. 3563), which, together with other appeals involving the same or intimately related subjects matter, will be discussed in this one opinion.

On February 28, 1927, the Wilmington court in the Meissner-Wilmington case entered a decree dismissing the plaintiff's bill and Armstrong's and Langmuir's counterclaims on a holding that De Forest was the first inventor of the subject matter in controversy, having reached that decision on the ground that the case, in principle, was governed by Morgan v. Daniels, that the plaintiff had not by new evidence overcome the evidential force of that decision, and that, independently thereof, the evidence showed that De Forest was the first inventor. (D. C.) 18 F.(2d.) 338. This case is here on the separate appeals of Meissner, Langmuir, Armstrong, and their assignees, being Nos. 3624, 3625 and 3626.

On March 17, 1927, the Wilmington court dismissed the bill in the Langmuir-Wilmington case on similar grounds. (D. C.) 18 F. (2d) 345. That case is here on Langmuir's appeal, being No. 3627.

[1] As the Philadelphia case was brought under section 4918, R. S., it is first necessary to determine whether it comes within that provision of the patent statutes. The section provides, in substance, that when the Patent Office has issued two patents which interfere,

the owner of either may sue the owner of the other by bill in equity to have the rival patent declared invalid. As before stated, the De Forest Company, the owner of the two De Forest patents, sued the Westinghouse Company, the owner of the Armstrong patent, praying that certain claims of the latter be declared invalid. Of course, the plaintiff in order to prevail must show that the contesting patents are interfering patents. Seemingly, the answer admits, by want of denial (equity rule 30), that they are. The trial court found they are. To this finding the Westinghouse Company assigns error on the contention that two inventions are here involved—the feed-back circuit and the oscillating audion; that these inventions, though related, are separate and distinct; that De Forest was granted patents for both while Armstrong was granted a patent for only one (the feed-back circuit) and that his application for a patent for the other (the oscillating audion), which was involved in the four-party interference, is still pending. On this statement the Westinghouse Company makes the argument—on first view persuasive—that as De Forest received two patents they must be for different inventions and, in consequence, both cannot be interfering patents with Armstrong's patent for one invention. Or, stated more particularly, it says that the Armstrong patent is for the feed-back circuit alone while one of the De Forest patents is for the oscillating audion alone; hence, in fact, there is lacking the essential of interference between these two patents and, in logic, the decision of the Washington court in the four-party interference on the De Forest claims covering the oscillating audion is not applicable under the principle of Morgan v. Daniels to the feed-back claims of the Armstrong patent.

It is true, broadly speaking, that one De Forest patent is for the feed-back circuit, the other for the oscillating audion, and that the four-party interference (the only interference proceeding in which Armstrong was a party) and the decree of the Washington court therein (for De Forest) had to do mainly with the oscillating audion, but not entirely, for that court, in order to decide who first invented the oscillating audion, had to decide who first invented the feed-back circuit. What invention, then, does the Armstrong patent cover? The Westinghouse Company insists (in this litigation) it is for a feed-back circuit alone. If that is true, then the Armstrong patent, though interfering with the De Forest feed-back circuit patent, does not interfere with the De Forest oscillating audion patent.

Here is a mixed question of law and fact. We find it difficult to answer it and thereby decide the scope of the invention of the Armstrong patent without anticipating the discussion on the invention itself. It will be enough to say just now that the feed-back circuit and the oscillating audion were discovered at the same time. We use the word "discovered" advisedly, for, in dealing with such intangible and mystical elements as electric currents, discovery of their operation frequently is simultaneous with a reduction to practice of something which was not conceived, that is, not thought of the instant before. Moreover, the feed-back circuit and the oscillating audion, if two inventions, are so closely merged into each other that it is hard to tell where one ends and the other begins. There can be no self-sustaining oscillations in an audion without a feed-back circuit and a feed-back circuit develops oscillations in the audion by mere change of energy. In other words, as all agree, the oscillating audion is but a single use of the basic arrangement of the feed-back circuit and without a feed-back circuit there cannot be an oscillating audion. The feed-back circuit is the cause and the oscillating audion is one of the effects of the phenomena and the discoverer of one (whether De Forest or Armstrong) was in fact, and of necessity, simultaneously the discoverer of the other. And, so, evidently thought the Washington court for it took the appeals from the three interference proceedings and considered them together and by one decision awarded priority of invention or inventions to De Forest, that is, it awarded the whole thing to him. But whether or not this was the view of the Washington court, manifestly it was the view of the New York court, for that court in the suit brought on the Armstrong patent against the De Forest Company accorded priority of invention to Armstrong over De Forest and in doing so construed the invention of the Armstrong patent not merely as a feed-back circuit but as a feed-back circuit conjointly with all its uses, among which, very certainly, is that of the oscillating audion. This is made clear by its decree wherein it enjoined the De Forest Company from making, using and selling any apparatus embodying the invention of the Armstrong patent "or any part of such apparatus, i. e., any and all arrangements of audion circuits by which oscillating current energy is transferred from the output or plate circuit to the input or grid circuit, to sustain the oscillations in the grid circuit." Claiming that the Armstrong patent contains a full disclosure of the whole subject matter of the in-

vention, that is, of both the feed-back circuit and the oscillating audion, Armstrong and his assignee, plaintiffs in that case, expressly requested of the District Court a decree which would broadly cover every phase of the invention—and got it. On appeal, the Circuit Court of Appeals for the Second Circuit, under like pressure from the plaintiffs, specifically approved the broad construction which the District Court had given the patent. It said:

"We think this excellent contribution to the wireless art should be accorded the full scope which the court below gave it in the decree. We think the decree is not too broad, but properly describes what the inventor conceived, and for which protection must be accorded to him."

We are constrained to hold with the learned trial court that the claims of the two De Forest and the one Armstrong patent in issue in the Philadelphia case are interfering claims and that, as some of these claims were in issue in the four-party interference, the decision of the Washington court is applicable to that case under the doctrine of Morgan v. Daniels. Earles v. Drake Mfg. Co. (C. C. A.) 300 F. 265; Victor Talking Machine Co. v. Brunswick-Balke-Collender Co. (D. C.) 290 F. 565, affirmed (C. C. A.) 8 F. (2d) 41, affirmed 273 U. S. 670, 47 S. Ct. 474, 71 L. Ed. ——.

In the appeals from the decrees in the Wilmington cases, we understand no question is raised as to the applicability of that doctrine; the one question there is whether or not, under the doctrine, the plaintiffs had overcome the legal effect of the award of priority to De Forest by the Washington court. Also we understand that the defense made in the pleadings in the Philadelphia case that the New York interlocutory decree is res judicata of the issues in that case is no longer pressed. Simmons Co. v. Grier Bros. Co., 258 U. S. 82, 42 S. Ct. 196, 66 L. Ed. 475.

And so, at last, we come to the main questions in issue. They are two, both of fact: One, have appellants overcome the evidential effect of the decisions of the Court of Appeals of the District of Columbia; the other (as we prefer to put it), which of the four claimants to the invention is shown by the evidence (aside from the decisions of that court) to be the first and original inventor?

We shall not in this opinion attempt a recital of the 4,320 pages of testimony given in these cases; nor shall we review the 286 pages of opinions which have accompanied the many patent tribunal and court decisions; nor shall we discuss the questions of evidence raised in the 17 briefs. Rather, we shall tell in outline the story of the invention from facts which are either conceded or, when disputed, have been found by us, and then state our conclusions.

De Forest had long been an electrical engineer and inventor of high order. In 1907 he invented the "epoch marking invention, the audion," and was, perhaps, more familiar with its organization and uses than any one else in the electrical arts. In 1912, when employed as chief research engineer for the Federal Telegraph Company at Palo Alto, California, he was engaged in experimental work on a great variety of subjects having to do with wire and wireless transmission of sounds. In August of that year he was investigating a two-way telephone repeater and the use of the audion for amplifying wireless messages. On August 6, 1912, when at work with only one available audion, he suggested to his laboratory assistant, Herbert B. Van Etten, that it might be possible to make the one audion do the work of two by obtaining greater amplification. He therefore directed him to connect the output circuit of the one audion back into inductive relationship with its input circuit. That, every one now concedes, was the feed-back circuit of the invention. Van Etten did this and, instead of the hoped-for amplification of telephone signals, he obtained a clear, pure musical note in the telephone receiver. Every one concedes that such a note is made by an alternating current or the sustained oscillations of the invention. Here are two facts; neither is disputed. Immediately, Van Etten entered them in his laboratory notebook. Neither the certainty of the entries nor the authenticity of the book has ever been questioned; nor has Van Etten's position as working under the direction of De Forest been attacked. Therefore, as we read the record, De Forest's claim to the invention starts with these facts and this date established.

The remaining claimants to the invention, and particularly Armstrong, have directed their attack not upon these facts but upon their effect, claiming, first, that, while De Forest did hook up the first feed-back circuit known in the art, he did not understand its operation or, stated differently, he did not have any conception of the inventive thing he had done—a case of ignorance after the event; second, that the clear note (evidencing a sustained alternating current) might have come, not from sustained oscillations, but from gas in the tube; and, finally, that neither the circuit nor the notebook entries dis-

close the invention described in the interference counts and claimed in his patents, because (a) they are audio circuits, hence not conceived or shown to apply to radio circuits; and (b) they do not disclose means for varying the frequency of the oscillations and the amount of the feed-back.

Though present and having some probative force, we shall lay aside the oral testimony of De Forest that for several months before August, 1912, he had been feeling for some such regenerative circuit, and also the testimony of both De Forest and Van Etten that when they attained it they clearly realized what it was and how it worked, and shall base our judgment of their conception upon testimony (mainly documentary) on what they did.

Whether De Forest advanced toward the invention intelligently or stumbled upon it is a matter of no concern, for it was an invention none the less. The United States government and three great industrial corporations claim it and all the world is using it. De Forest may have made the feed-back hook-up without any preceding notion of how it would work; an order of things, we surmise, not unusual in electrical inventions. It did work. Whether De Forest or Van Etten at once knew its theory of operation and its capabilities is not important if they recognized the phenomena and were able, at will, to re-set the circuit and reproduce the result. The First Assistant Commissioner of Patents, while he conceded to De Forest the new and startling thing he had done on August 6, regarded it as a laboratory experiment and held that De Forest then abandoned it, contrary to the later finding by the Washington court that it was a complete reduction to practice. Laying aside the oral testimony of De Forest and Van Etten that they deliberately turned from their work on a two-way telephone repeater to investigate the alternating current phenomena they had observed from the feed-back hook-up and tried other arrangements to obtain this same result, we come to the next fact recorded in De Forest's notebook, that on August 29, three weeks later, when De Forest and Van Etten made a hook-up which, though different in arrangement from the first, was none the less a feed-back circuit. This, though controverted, we regard as indubitably established. To this point at least we hold against the theory of abandonment and find, on documentary evidence, no lack of diligence on the part of De Forest in following up his first discovery. Moreover, we think that his ability on August 29 successfully to reproduce

the invention of August 6 evidences his understanding of his invention when first practiced; that, even if he lacked inventive conception in the first demonstration, he had it in the last, and that at least the two together constituted a complete reduction to practice.

A few days after the last demonstration, De Forest, being poor and very anxious to raise money with which to exploit his inventions, went to New York with the hope of selling rights under his audion for use in the transmission of long distance wire telephone messages. On October 29, 1912, when in New York, he met Doctor John Stone Stone, an eminent radio engineer and consulting engineer of the American Telephone & Telegraph Company with which he was conducting his audion negotiations, described to him his August work and discussed with him its use in radio. At that time (according to his own testimony and the corroborating testimony of Doctor Stone), he made and showed Doctor Stone a rough draft of the feed-back circuit by which he could develop continuous trains of oscillations. So clear was Doctor Stone's memory of this drawing that he reproduced it when on the witness stand, describing it as differing in no material respect from the usual audion detector circuits "except that means were provided for inductively connecting the plate circuit of the audion with the grid, or, to put it slightly different, the output end of the audion with the input end." Still referring to De Forest's sketch, he said: "This drawing showed me for the first time what the necessary relations were in order that oscillations of the audion might be self-sustaining." Doctor Stone's evidence was a part of the record in the Washington case and in that way is before this court. No attempt was made to impeach Doctor Stone and little was done to weaken his testimony. It fully corroborates the evidence, oral and documentary, as to the two August demonstrations. Aside from disclosures which De Forest made to at least one fellow employee during the progress of his August work, his disclosure of the invention to Stone was, in the sense of the patent law, complete.

Some time in the fall of 1912 Armstrong first appeared in the situation. He was a student at Columbia University and an amateur radio investigator. His youthful enthusiasm and intelligent approach to the invention, like De Forest's struggle through poverty to his inventive achievement, was truly a romance in science. But as both inventors have parted with their inventions, we shall, of course, regard them in the cold light

of the facts as they repose in the hands of their assignees.

Using a De Forest audion, or three-element vacuum tube detector, Armstrong so arranged the currents that he obtained an increase of signal strength. In the course of his experiments he developed what seemed to him remarkable results. He let his father listen in and, on December 7, 1912, told a collegemate about these results. He also demonstrated the sensitiveness of the instrument to other fellow students, yet always without disclosing the circuits. As he intended to apply for a patent when he could raise the money, he was all the while very careful to conceal the circuit arrangement. However, on January 31, 1913, he made a tracing of the circuit connections and had it witnessed before a notary public. Thus the courts have uniformly accorded him that date as the date of his invention. Being a record disclosure of what he had then (or, perhaps, before) reduced to practice, we think the courts were right. As we have disregarded De Forest's oral testimony of his work previous to his reduction to practice and accorded him a date shown by his first record evidence, we think Armstrong should be similarly restricted and be accorded no date earlier than that of his first record entry.

From these fixed contesting dates—August, 1912, and January, 1913—the stories of the two inventions run on. De Forest, having failed in his New York negotiations for the sale of audion rights, returned to California in the latter part of January, 1913, and resumed his position with the Federal Telegraph Company. He also resumed his work with the audion as a heterodyne receiver, and on April 17, 1913, wrote in his notebook that on that day he had gotten "the long looked for beat note" by an adjustment indicating the feed-back circuit, whereby "the real heterodyne phenomena" were produced. This is De Forest's third record entry. It contains no drawing and, in consequence, is attacked on the theory that the result recorded might have been obtained by a circuit different from that of the feed-back or through gas action of the audion. This contention is controverted by De Forest's rebuttal testimony. We shall postpone its consideration until we come to the gas action phase of the litigation.

Some time during the winter of 1912–13 De Forest sold certain audion rights to a subsidiary of the American Telephone & Telegraph Company for $50,000. Being in funds, he severed his connection with the Federal Telegraph Company and, in the last of April, 1913, departed for New York where he organized a corporation, established a laboratory, sent for Longwood, one of his fellow workmen in California, and embarked on the development and exploitation of his inventions, among them the invention in suit.

On October 1, 1913, Longwood connected up an audion with the feed-back circuit with pancake or radio frequency coils, one in the plate filament lead and one in the grid filament lead inductively associated, and entered in his notebook the following: "Connected up the audion the same way we did at Palo Alto to make it sing. This singing that occurred in the amplifier is caused by reaction in the circuits and is very hard to get rid of, but other uses can be made with singing effect." On October 4, 1913, there is a record entry of the same circuit arrangement with condenser for varying the pitch. On October 6, 1913, the same circuit is shown with radio frequency coils replacing the audio-frequency coils.

On March 12, 1914, De Forest and Longwood applied for a patent, showing in Fig. 1 the feed-back circuit of August 6, 1912. On March 20, 1914, De Forest's application, which matured as patent No. 1,507,017, was filed disclosing the feed-back circuit and the production of alternating currents. In the meantime, Armstrong, on October 29, 1913, had applied for a patent which was not issued until after the date of De Forest's application. The significance of this is that De Forest applied for a patent before Armstrong had made a public revelation of his invention. In 1915 it was discovered that the De Forest and Longwood application contained, in addition to the subject matter of their joint invention, matter which was the sole invention of De Forest. This matter was canceled and incorporated in an application by De Forest alone, filed September 23, 1915, eventually maturing in patent No. 1,507,016. At the time of his patent applications, De Forest doubtless knew that Armstrong had done something of importance in the radio art but we cannot find that he knew what it was, and, in consequence, we do find that the two inventors still continued on their ways independently of each other, resulting ultimately in the commercial use of the De Forest invention by the United States government in April, 1914, and the commercial use of the Armstrong invention at Sayville, Long Island, shortly after the outbreak of the war in August of that year.

We are of opinion that De Forest's was the first invention of the subject matter in issue unless the clear musical notes, which we are told evidence an alternating current set up by the feed-back circuit, were set up by a

circuit of some other kind or were sounds caused by gas in the audion. There were (on the evidence) only two kinds of circuits in the arrangements used at the time the invention was reduced to practice. These were the three old standard electrode circuits and the one new feed-back circuit. As no one has claimed that these circuits would not set up oscillations which in turn would produce the new notes, and as no one has shown any other circuits that would produce them, we must hold they were produced by the ones capable of doing it. As to the musical notes possibly being the result of gas in the audion, we observe that at the time of both the De Forest and Armstrong inventions, the only audion tubes in use were "gasey" or "soft." It is admitted that oscillations can be produced by feed-back in gasey tubes as well as in the later "hard" tubes. If this were not so, the same uncertainty would extend to Armstrong's invention and none of the parties joining him in his attack on De Forest has made that suggestion. However, when De Forest reduced his invention to practice there was present the feed-back hook-up; a feed-back circuit properly energized will develop alternating current; alternating current will develop such sounds as he obtained. On these certain data we resolve the issue against the conjecture of gas origin.

[2] Finally, some of the parties, particularly Langmuir, contend that the Philadelphia and Washington courts misconceived the invention; the first court, by ignoring the specifications and adhering to the claims of the De Forest patents, the second, by following blindly the counts of the interference; and that, in truth, the De Forest invention relates only to a wire signalling system. As we understand it, the contention is that De Forest, who discovered the phenomena and made the invention when working on a two-way repeater telephone system, did not discover its use in a wireless system, hence his invention, if any, should be limited to the system of audio circuits on which he was working when he made the discovery. But De Forest made a discovery singularly useful in a wireless system by which electrical vibrations, whether of radio or audio frequency, are sustained. (He did not have to disclose what was already known about controlling frequencies in alternating currents by controlling the amount of inductance.) Hence his invention is something broader than a particular use. It is for a feed-back circuit employing currents of any frequency, and not specifically radio or audio frequency currents. Currents of both kinds are employed in every wireless apparatus. His invention was for the feed-back including the oscillating audion itself. It was therefore as broad as its uses. And so the counts in the interferences were formulated. Armstrong and Langmuir did not object to them when so framed but entered the contest and respectively fought for them as descriptive of their own inventions covering all phases, all frequencies and all uses. Moreover, Armstrong specifically claimed (and in the briefs still claims) that his invention thus defined *anticipated* the invention of both De Forest patents. Without identity, one invention cannot anticipate another. When these parties lost, they adopted the exact language of the interference issues as defining their inventions and under section 4915, R. S., asked the court to award them patents for inventions of that precise breadth. Without regard to their tardiness in raising this contention, we think it lacks substance.

In the appeal of Langmuir and his assignee from the decree in the Langmuir-Wilmington case, there is involved issues arising from the counts in interference proceedings No. 41,225 and 41,224, some of which are distinguished from others as "works circuit" counts, and three of which were eventually extracted and made to form the subject matter of the separate interference No. 41,790 in which Armstrong joined. We shall not restate the question there involved and the grounds for our conclusion because it would amount to nothing more than a repetition of the opinion of the Wilmington court in that case, to whose reasoning we subscribe.

We have directed our main consideration of this group of cases to the issue of priority between De Forest and Armstrong for the dates of invention claimed and accorded them respectively are prior to any date claimed by or available to Meissner and Langmuir. Any subsequent inventions by either of these parties, therefore, ceased to be pertinent to the issue.

[3] We cannot review in this opinion the new testimony produced to overcome the evidential effect of the decisions by the Court of Appeals of the District of Columbia. We have considered that testimony with great care and are of opinion that in character and amount it is not sufficient, within the doctrine of Morgan v. Daniels, to overcome the controlling effect of that court's decisions. Moreover, independently of the decisions of the Court of Appeals of the District of Columbia, we are of opinion that the evidence establishes that De Forest conceived the invention and reduced it to practice in August, 1912; that he was therefore the first and

original inventor; that thereafter he did not abandon it and did not lack diligence in applying for patents.[1]

Therefore the decree of the District Court of the United States for the Eastern District of Pennsylvania and the decrees of the District Court of the United States for the District of Delaware must in all respects be affirmed.

---

[1] What will be the practical effect of this finding of priority of invention in favor of De Forest may be gathered from the records in these cases now on appeal and the record in the case of De Forest Radio Telephone & Telegraph Co. v. Radio Corporation of America (C. C. A.) 20 F.(2d) 598. It is a situation created by a series of licenses which, while interesting, is not pertinent to the issues here involved and therefore is a matter on which this court expresses no opinion. It is stated by the De Forest Company in one, of its briefs as follows: ·

"As heretofore stated the American Telephone and Telegraph Company has a license under both of the patents which have been issued to the De Forest Company, as well as the right to grant licenses thereunder (Defendant Telephone Company's Exhibit No. 4, R. vol. 3, p. 229; R. vol. 3, 186–272).

"As appears from the Defendant Telephone Company's Exhibit No. 2 (R. vol. 3, p. 199), the General Electric Company acquired a license from the Telephone Company under these patents.

"It is also claimed by the Westinghouse Company that it acquired a license pursuant to Defendant Telephone Company's Exhibit No. 3 (R. vol. 3, p. 223) under these patents.

"If this latter contention is correct (which question· is already before this court for decision in De Forest Radio Telephone & Telegraph Co. v. Radio Corporation of America, No. 3462 (C. C. A.) 20 F.(2d) 598, it is perfectly apparent that should ·the De Forest Company's right to this patent be confirmed by the decision of this court, that the practical effect thereof so far as the General Electric and the Westinghouse Company are concerned, will be simply to allow the De Forest Company to use the inventions of the patent.. The other parties to the suit—the General· Electric Company, the Westinghouse Electric & Mfg. Co., and the American Telephone & Telegraph Company (all except Meissner) will have the right to use the inventions for the full life of the patents without the payment of any royalties."