## GENERAL ELECTRIC CO. v. DE FOREST RADIO CO. (two cases).

## DE FOREST RADIO CO. v. GENERAL ELECTRIC CO.

### Nos. 3799–3801.

Circuit Court of Appeals, Third Circuit.

Nov. 11, 1930.

WOOLLEY, Circuit Judge, dissenting.

Howson & Howson, of New York City, and William G. Mahaffy, of Wilmington, Del. (Ralph B. Evans, of Philadelphia, Pa., Hubert Howson, of New York City, and Albert G. Davis and Charles McClair, both of Schenectady, N. Y., of counsel), for appellant.

Ward Gray, & Ward, of Wilmington, Del. (Thomas G. Haight, of Jersey City, N. J., and Samuel E. Darby, Jr., Carl A. Richmond, and William R. Ballard, all of New York City, of counsel), for appellee.

Before BUFFINGTON, WOOLLEY and DAVIS, Circuit Judges.

BUFFINGTON, Circuit Judge.

In the court below the General Electric Company charged the De Forest Radio Company with the infringement of four patents. On final hearing that court held one of the patents valid and infringed and the other three invalid. By appropriate steps its so holding was brought before this court for review. Without entering into detail, we may say that, save as to patent No. 1,558,436, the reasoning, conclusion, and decree of the court below commend themselves to us, and we affirm the same. In the case of patent No. 1,558,436, we feel the court below committed error in holding the patent invalid and dismissing the bill.

As usual in litigation over a patent of great commercial value, the vast mass of expert speculation, the protracted argument covering days, and with briefs that in the aggregate covered several hundred pages, the case, on reargument, narrowed to the simple question of the patent paternity of what is known commercially as the Langmuir tube. The court below held the tube had no patent paternity, and to that question we now address ourselves. The subject-matter of the patent and the general features of the pertinent art are set forth at length in the comprehensive opinion of the judge below, and by reference thereto we avoid the necessity of present restatement.

Laying aside for the present technical language and scientific discussion, and confining ourselves to simple statement, the Langmuir tube is a tube in which, for example, the gaseous conductor incident to a Fleming valve and a De Forest audion is dispensed with and a vacuum substituted therefor.

In the patent sued on, No. 1,558,436, granted October 20, 1925, to Irving Langmuir, assignor to the General Electric Company for "electrical discharge apparatus and process of preparing and using the same," the specification states:

"The present invention relates to electrical *vacuum* discharge devices, and it comprises devices in which the electrical current is carried by negative charges called electrons, emanating from the cathode, independently of *gaseous ionization* such as occurring, for example, in the ordinary Roentgen tube.

"My present invention comprises improvements in electron-discharge apparatus which make possible a *high load capacity* and operation with the *highest voltages,* but the invention is also applicable and useful for moderate loads and moderate voltages."

Existing objectionable incidents to the use of gassy tubes and the erratic, nondeterminable action of gas are pointed out as follows:

"In order to distinguish electron discharge devices made in accordance with my invention from the prior art, I will explain briefly the character of a *pure electron* discharge as distinguished from a discharge through *ionized gas*. In a Geissler tube, and in a Roentgen or Crookes tube the conduction of current is accompanied by and depends upon *gas ionization*. Without a certain *minimum amount of gas* a Roentgen X-ray tube ceases to operate and as this minimum is approached the resistance of the tube steadily increases.

"The passage of an electric current across a tube ordinarily involves the movement of negative charges called electrons which, under the influence of the impressed voltage, pass from the cathode to the anode through the *vacuous space*. If these electrons when

moving above a certain velocity collide with *gas molecules* they tend to ionize the molecules, splitting them up into electrons and larger and more slowly moving ions. Under these circumstances the phenomena of conduction across the tubes are the result of the action and interaction of the electrons and the ions; these phenomena are in general *erratic and non-reproducible.* The cathode under these conditions is disintegrated, technically it is 'sputtered,' which causes its rapid destruction. As *gas ionization* continues at higher voltages a *blue glow* may appear. The bombardment of the cathode by positive ions also causes heating of the cathode. The ionization of gases at low pressures by collision with electrons occurs at definitely determinable voltages, these voltages being known as the ionization voltages. *These voltages are different for different gases.* In the case of gases such as nitrogen, hydrogen, oxygen, argon, helium and neon, they are of the order of magnitude of fifteen to twenty-five volts."

Describing the De Forest audion, and differentiating it from the alleged invention of the patent, the specification says:

"The phenomena above described as being characteristic of devices involving *gas ionization* are taken advantage of in an incandescent cathode device with three electrodes known as the 'Audion.' This device has been used as a receiver for radio-telegraphy and depends in its operation upon the rapid change of the discharge current when *gas ionization begins.* This point depends upon various *accidental* conditions which cause such irregularities in the operation of various devices apparently identical that sometimes only one of a considerable number can be used. Ordinarily the gas ionization in the audion begins to be important somewhere between 20 and 30 volts."

Describing the Fleming valve and its limitations, the specification states:

"Another discharge device previously used to some extent was the *Fleming valve.* This was a two-electrode tube which, so far as I am aware, was always used at voltages well below the voltages at which positive ionization by collision occurs. It was not evacuated in such a manner as to permit it to be used at voltages materially above these ionization voltages without manifesting substantial positive ionization effects."

Referring to high voltage, the specification makes this statement:

"No prior hot cathode devices are known to me operating with currents as great as above 5 milliamperes with voltages as high as about 200 volts; indeed no prior discharge devices are known to me operating in a practically usable manner and without substantial positive ionization effects with currents as great as about one-tenth of a milliampere with voltages as high as about forty volts."

Specifying some of the differences and advantages of the alleged invention, the specification states:

"In devices made in accordance with my invention *gas ionization* is either entirely *absent* or is negligible and a discharge takes place which is *distinct* in its characteristics from the described discharge taking place in an *ionized gas.* The cathode is not heated by the discharge itself. Blue glow glass fluorescence and in fact all readily visible indications of a discharge are ordinarily absent."

Referring to the evacuation of the tube, the specification sets forth:

"For the evacuation of the device the glass walls of the tube are carefully heated to as high a temperature as the glass will stand without softening and in general the most approved methods of incandescent lamp exhaust are used. The evacuation of the tube preferably while still heated is carried out by means of a suitable evacuating means, for example, a Gaede molecular pump, which removes *vapors as well as gases.* * * *

"The evacuation of the device should be preferably carried to a pressure as low as a few hundredths of a micron, or even lower, but no definite limits can be assigned. * * *

"It is also true that when the anode has been carefully freed from gas, residual free gas, even if present in a sufficient amount to cause some gas ionization when the apparatus is first started, does little harm, as it is quickly removed by the gas clean-up effect when the device is operated."

Claim 12, which is, "An electrical discharge device, comprising a gas-tight-envelope, an electronemitting cathode, an anode *deprived of ionizable gas* and a discharge controlling conductor, the space in the envelope being evacuated to a pressure not substantially in excess of a few hundred thousandths of a millimeter of mercury, said device being characterized by the fact that when operated below saturation and materially above the ionization voltages, the current is controlled by *space charge* substantially unaffected by positive ionization," is typical in character of the alleged invention.

Does the defendant use a tube answering this general description? We think it does, and that in giving up the old gaseous tube and using one of the "very high vacuum," a change which it announced in its statements to the public, we have a virtual admission of the essential difference between the two tubes. The tube of this disclosure is aptly described as "non gaseous" and "of a very high vacuum" by the defendant when putting it on the market, as follows:

"The tube consists of a highly evacuated vessel, cylindrical, rather than bulbular, in shape enclosing the three elements, grid, plate and filament in the form of the old type T tubular DeForest tube with which amateurs are familiar. The plate is of nickel, cylindrical in shape and surrounds a helical grid also of nickel. The filament is a crimped tungsten wire passing through the center of the grid exactly as it did in the old style type DeForest tube. The chief difference between this tube and the type T tube of similar mechanical construction is in its evacuation. The old style type T was an *ionic or gaseous tube* very unstable in operation and requiring a variable 'B' battery. It had the decided disadvantage that after continued use the tube would get 'hard' and require more 'B' battery until it reached such a state as to be inoperative. The new 'VT' tube, like the DeForest standard tubes to-day, is purely an electronic tube exhausted to a *very high vacuum*, so that it is non-gaseous and will stand very high plate potentials. When used as a detector, however, a battery of 20 to 40 volts is sufficient to give the proper plate current although voltages of 80 to 100 may be used without detrimental effect upon the tube. The 'B' battery moreover, is not critical in adjustment and, therefore, a fixed battery may be used and is used for all practical work. * * * The gaseous type tubes are, however, no longer being manufactured."

▮ Turning next to the question on which the validity of the patent depends, we inquire first as to its usefulness, for the constitutional power to create the monopoly of a patent in that regard conditioned "to promote the progress of * * * useful arts" and the Congressional enactment in pursuance of the Constitution is that "any person who has * * * discovered any new and useful," etc. For in the final analysis, use, usefulness, is the acid test, the sine qua non of patent grant.

The unusual degree of usefulness of the tube may be assumed. The defendant by its use evidences its usefulness, and has, we have seen, adopted it and ceased making "gaseous type tubes," and the court below, after its exhaustive study of the art, aptly described the tube, and we agree with its estimate, as an agency which "because of its stability, reproducibility and power has made possible radio broadcasting, modern radio reception and long distance telephony."

Seeing then we are here dealing with a progressive step which, next to the telegraph, the telephone, and the wireless, is probably one of the most far-reaching and beneficent in human progress, there can be no question of a nongaseous, vacuum tube's usefulness. Such being the case, is it novel? The simple fact is that we see such a tube in universal use to-day; we know in the quoted language of the court below of its "stability"; of its "reproducibility"; of its "power." We know that these elements have, as stated by the court below, made "possible radio broadcasting, modern radio reception and long distance telephony." Indeed, the fact that a nongaseous vacuum tube makes possible the present improved practice shows that such practice did not exist before the Langmuir tube, and that no other device or devices, allimportant as they may have been in their spheres, did either singly or collectively produce the present practice. The Patent Office recognized that. In the opinion of The Board of Examiners they found, in affirming the decision of the Examiner of Interferences, that "Langmuir was the first to conceive and the first to reduce."

While all the vast mass of knowledge testified to in these records was open to everyone to use, the simple fact remains that the nongaseous tube of modern use did not occur to scientists. Every one of the two hundred and sixty-six words in Lincoln's Gettysburg Speech is found in the dictionary; most of them in the Bible. But it remained, not for Noah Webster or even the prophets of old, but for Abraham Lincoln, to take these isolated words and so use them conjointly as to produce the most remarkable combination in literature.

We do not disregard or minimize the allimportant part of De Forest's audion and Fleming's valve play in the utilization of them in the Langmuir tube, but, in spite of such high value, neither of them, in isolation or conjoint use, gave the world the tube here in question, and it remained for Langmuir to so couple and co-ordinate the two by means of eliminating gas and using vacuum

as to produce the tube here involved. What scientific credit is due to De Forest or Langmuir or to what patent tribute Langmuir subjected himself in thus using their devices are questions not before us.

Moreover, the statement in the commercial circular of the De Forest Company that gas was an element of operation was in accord with the then scientific belief. In 1911 Gernsback, an experienced savant, wrote that in the audion "the operating principle is the shattering of a column of conducting gas by a received electrical impulse."

The function of a gaseous tube as a conductor was stated by the Circuit Court of Appeals of the Second Circuit in Marconi Wireless T. Co. v. De Forest Radio T. & T. Co., 243 F. 560, 565, where Fleming's valve and De Forest's audion were considered, in these words: "The 'gaseous medium' of the audion is nothing but the commercial vacuum of the ordinary electric light bulb—air being a gas, and the bulb containing some residual air. In other words, defendant uses the same 'vacuous vessel' that Fleming does." And in its opinion it stated that it was asserted in that case that the audion was "an apparatus in which the bulb contains 'a substantial amount of gaseous medium' essential to operation of the device." To the same effect is the testimony of Langmuir, of which we find no contradiction, that:

"In the devices of the old art, in the De Forest audion, the pressure was continually changing. It sometimes increased and it sometimes decreased. Both things went on and there was an evolution of gas, water vapor would come off the bulb and be decomposed by the filament and it would generate gas. Gases would come out of the electrodes. Positive ions would bombard the walls and the electrodes would drive gas off."

It will also be noted this court in its able and exhaustive statement of the art in Westinghouse Electric & Mfg. Co. v. De Forest Radio T. & T. Co., 21 F.(2d) 918, 927, said: "We observe that at the time of both the De Forest and Armstrong inventions, the only audion tubes in use were 'gasey' or 'soft.'"

That its action was eccentric is shown by De Forest's statement:

"In the first place, anyone who has had considerable experience with numerous audion bulbs must admit that the behavior of different bulbs varies in many particulars, and to an astonishing degree. The wing potential wing current curves for different bulbs, or even for the same bulb at different times, under different conditions (filament temperature, etc.) vary widely.

"What may appear to be a fixed law for one bulb may not hold for another."

On the other hand, the current in Langmuir is practicable, steady, reproducible at any particular voltage.

It further appears that the Langmuir tube has a great advantage when it comes to replacement. When a tube is defective, another of the same type can be bought and placed in the same socket. Not so with the audion. It required frequent replacement, and, where replacements were made, it was necessary to readjust throughout the circuit. In that respect the proof is:

"XQ. 35. What practical effect would harmful ionization have upon an audion amplifier such as, for example, is used in the telephone line?

"A. The worst immediate effect would be as to uniformity of operation, which would make continued adjustments necessary and would interfere with the replacement of one device by another, that is to say, when one tube burned out and another were put in an amount of ionization that would interfere with uniformity of operation would make it necessary to readjust throughout the circuit to take care of the substitute tube."

As to the replacement, the proof is that:

"Another consequence of this uniformity is that replacement of the tubes without changing the apparatus becomes possible. That is particularly important in telephone repeaters and in radio devices both of the receiving and transmitting type. One wants to know that he can replace a burned-out tube with a new tube without having to make substantial changes in the apparatus."

It will also be noted that the whole trend of the art was against the use of a vacuum, and, even after Langmuir had shown its use, it was deemed impractical. Thus in a paper of 1914 Wehnelt and Leibreich said that ionization persisted in the best vacuum they could get.

Moreover, it is of great present significance that the then view of De Forest himself was against Langmuir's use of the vacuum; he then stating in a paper read by him before a scientific body: "I believe, however, Dr. Langmuir has, by working into these high vacua and the high potentials necessitated thereby, pursued the less promising of the two paths of research." The record shows no explanation, comment, or retraction by him of this statement.

Such being the general state of the case, has the defendant by evidence overcome the prima facies of the patent? We think not. As said by this court in Penn Electrical & Mfg. Co. v. Conroy, 159 F. 943, 948, citing the Barbed Wire Case, 143 U. S. 275, 12 S. Ct. 443, 36 L. Ed. 154, "The burden of proof upon this part of the case rests upon the defendant, and every reasonable doubt should be resolved against it." And in our view the crux of the case is one of fact, namely, whether the use of a vacuum in the combination of the claim was Langmuir's novel disclosure. We are not concerned with scientific theories and speculations as to what might have been done or what could possibly have been done, for, as well said by the Circuit Court of Appeals of the Second Circuit in General Electric Co. v. P. R. Mallory & Co., 298 F. 579, 582, we sit "not as scientists, but as weighers of evidence." But we are concerned with the fact whether the combination of the claim which Langmuir disclosed was new. That some had bombarded anodes of X-ray tubes to get some of the gas out of them, that others had heated bulbs or used pumps to lessen the gas, may all be true, but none of them had produced the commercial tube which Langmuir gave to the public. And such actual contribution in use and not theory and possibility of speculation is, and of right should be, the decisive factor in patent reward. As was said by the Circuit Court of Appeals of the Second Circuit in O'Rourke Engineering Court Co. v. McMullen, 160 F. 939:

"The keynote of all the decisions is the extent of the benefit conferred upon mankind. Where the court has determined that this benefit is valuable and extensive it will, we think, be difficult to find a well considered case where the patent has been overthrown on the ground of non-patentability."

We regard as of high evidential significance the statements made by the defendant in its circular to the public, already quoted. It will not do to brush aside and ignore it on the suggestion it was the work of some enthusiastic subordinate or sales agent. It was a deliberate statement of a great mechanical company of its ceasing to make and market a superseded article and to thereafter make and market a new and different one. No such change would in business practice be made by subordinates, but was, in the nature of things, the mechanical, scientific, and commercial determination of a great business organization. In this statement the defendant recognized a "non-gaseous," highly vacuum tube as new. As we have seen, it differentiated it from its "gaseous" tubes up to then made, and publicly announced that such gaseous type tubes would no longer be manufactured. And, indeed, that no such nongaseous, highly vacuum tube existed is shown by the fact that the testimony of experts and the laborious research by the judge below, whose industry is proverbial, did not disclose any such tube, as both parties to this litigation now make and contend for the right to make, existed, or had advanced the arts in question to this new standard of theretofore nonattained efficiency.

Such being the case, the defendant is driven to take the position—which found favor with the court below—that, in view of what existed in the prior art, it required no invention to so utilize these things in the prior art to produce a nongaseous, highly vacuum tube, and that this great progressive step was due simply to the art's natural advance and improvement.

But in point of fact no such advance toward a nongaseous tube, as we are now told was to be looked for in the art, was actually made by the art. We would not be misunderstood. Advance, inventive and noninventive, was being made in the art, but their efforts were in other directions. We would not detract from the great advance made by De Forest and exemplified by his audion and by Fleming with his valve, but great as these steps were, both separately and collectively —and we regard them as the foremost in the advance of the art in the sphere here involved —the gaseous tubes still continued to be used and the art generally regarded gas as incident, if not, indeed, indispensable, to their use.

Indeed, had the art followed the caution of De Forest heretofore quoted, we would have no vacuum tube, a situation akin to that referred to by this court in the Turbine Case, 202 F. 932, 952, where we said:

"Finding, then, as we do, that the disclosures of the Moorhouse patent had no helpful bearing or practical effect on the impulse turbine art, and supported in that conclusion by the fact that its vagueness is such that fair-minded witnesses in this record greatly differ as to what its disclosures really are, we are not warranted in attributing to it any effect in the way of vitiating, or even minimizing, the work of Curtis."

Now, as it seems to us, the art, although it did not exactly know how the gas in gaseous tubes acted and just why it was able to

so conduct, nevertheless continued to use it, and regarded it as the indispensable means of conducting. As against this firmly entrenched teaching and practice of the art, Langmuir's suggestion of eliminating gas as a conductor was a radical change, and even more so was not the substitution of some other tangible conductor but the disclosure of supplanting the tangible gaseous conductor by the intangible conductor of a vacuum. Vacuums, per se, were of course known. De Forest's audion and Fleming's valve were equally known, but the suggestion of dispensing with gas and utilizing a vacuum between the two was as novel in practice as it was unlooked for in result. Indeed, shortly before the patent in suit was applied for, and even though the use of a vacuum may possibly have been suggested, the director of the Research Laboratory stated in a paper read before the American Institute of Engineers: "In connection with this work of Fleming's, we have studied the effect of vacuum on the current, and also found that the presence of gas is necessary for this negative discharge." And that Langmuir's use of high vacua did not appeal to so practical and eminent a scientist as De Forest was evidenced by his statement, heretofore quoted, made even after Langmuir had made known his process publicly: "I believe, however, that Dr. Langmuir has, by working into these extremely high vacua and the high potentials necessitated thereby, pursued the less promising of two paths of research." For the defendant to now contend that the use of these extremely high vacua by Langmuir was simply the natural and to be expected growth of the art is to credit the ordinary art with a scientific capacity which a master of the art like De Forest did not himself possess. If it was an obvious thing, as the court below believed and decided, for the ordinary art to do away with gas and gaseous tubes and substitute high vacua therefor, surely such an extraordinary mind in that art as De Forest, when confronted with the substitution, would not have pronounced high vacua a mistaken path. Had the ordinary art followed the advice of this superordinary adviser and leader, and discarded the suggestion of high vacua, it would seem, so far as the universally used nongaseous tube is concerned, it would not be in use to-day.

But it is contended by the defendant, and the court below so held, that all that Langmuir did was simply to vary in degree the prior use of the vacuum, and that a mere difference in degree does not constitute invention, or, to use the defendant's contention, the Langmuir tube is "nothing more or less than the identical thing of the prior art with possibly a little higher vacuum, depending on the specific use to which the device is to be put." Assuming the correctness of this general proposition, we think it is not applicable to the present case. In considering change in degree, the test is not the quantum or minimum of change made, but the quantum of change in function and result which such change, great or small, effects. A great change may effect but a slight change in function and result, while a slight change may effect a radical difference in function and effect. The effect, the practical progress and use in the arts, are the aim and end of patent grants, and, where great results follow a change, the slightness of the change tends to emphasize and make all the more remarkable, unexpected, and inventive the disproportionate result the slight change effects. It was the slight turn of a screw and the closer proximity of the diaphragm that made the telephone diaphragm the carrier of speech and gave Bell the due reward—not for the slight turn of the screw but for the great effect it wrought. But a vacuum, or, indeed, change of vacuum, isolated and standing by itself, is not the Langmuir invention, but it is a working tube in which all the elements, cathode, plate, vacuum, so co-ordinate and interwork that current flow is not affected by gas. We say not affected by gas because of necessity an absolute vacuum is an impossibility, but the degree of vacuum is such the current flow is no longer objectionably affected by gas. Just what the degree of vacuum shall be is dependent on several elements, and, as stated in the patent, cannot be exactly stated. In that regard the specification says: "The evacuation of the device should be preferably carried to a pressure as low as a few hundredths of a micron, or even lower, but no definite limits can be assigned."

So regarding what we believe to be the basic question in the case, we limit ourselves to the foregoing statement of our reasons for our conclusion. But, in thus limiting our discussion, we deem it proper to say that the numerous questions and considerations advanced in the case in other particulars have been duly considered.

The decree of the court below holding this patent invalid is reversed, and the record remitted, with instructions to enter a decree that the patent is valid and infringed.

WOOLLEY, Circuit Judge.

I am constrained to dissent from the judgment of the court holding the Langmuir patent No. 1,558,436 valid. I have the same trouble that other tribunals have had throughout the twelve years of the patent prosecution and five years of the patent's life in finding precisely what Langmuir invented. My trouble, like that of others, has been increased by the difficulty which attorneys for the patent have had in defining the invention and by the difference between their definitions and the claims of the patent.

This is more than a mental disturbance, for manifestly a patent to be valid must relate to some invention, something patentably new and useful, and must disclose the invention so that a court, looking through the eyes of those skilled in the art, can see what it is.

The art—really two related arts—is that of wire and wireless telephony, the latter commonly called radio. The invention relates generally to an electron discharge device comprising the familiar vacuum tube in which the customary electric current is carried by negative charges called electrons from the cathode to the anode, sometimes associated with a grid, and relates particularly to a vacuum space so free from gases as to avoid ionization. If the parts and principles of the mechanical construction were new and the gas evacuation old, there might be invention; and also if the structure and its principles were old and the gas evacuation—high vacuum—were new, still there might be invention. But the essential parts and principles of the mechanism, comprising a tube, cathode, anode and grid, were old, and high vacuum in the tube also was old. So the inventor was forced to admit the presence of these old elements, yet, still insisting he had created something new, he was compelled to avoid the common art terms applicable to these elements and particularly that of "high vacuum" in disclosing his invention and use technical terms which, as I understand them, mean the same old things. With this necessarily general preface to a highly complicated situation arising out of a difficult art, I come to the matters in hand.

In an effort to find what Langmuir invented, it is well to begin at the beginning. I shall therefore turn to his application for a patent, for in that instrument must appear the substance of the invention as the basis for subsequent amendments and for the patent as it eventually matured.

A recital of the prosecution of a patent application through the Patent Office is dreary reading yet, in this instance, it shows quite clearly that even the applicant was far from certain what he had invented. Naturally I hesitate to say this about Irving Langmuir, a great physicist, yet, saying it with entire respect, I am convinced that the history of the application establishes that fact and therefore is pertinent to the ever present inquiry: What did Langmuir invent?

The patent issued on October 20, 1925. The application was filed on October 16, 1913; renewed March 14, 1916. These are critical dates. The original application contained five claims; two for process of removing ionizable gas from vacuum electron discharge devices, that is, in plain words, for obtaining a high vacuum, and three for methods of preparing such devices, and no claims for discharge devices themselves. The specification conformed to these claims, referred to the art, stated the problem, disclosed construction adapted to the operative principle of such tubes and showed how they can be "evacuated" of gases by heating the glass walls, heating and bombarding the metal parts, thereby expelling occluded gases, and drawing off both free gases and expelled gases "by a suitable evacuating means, for example, a Gaede molecular pump."

It should be noted that when the application was filed in 1913 the radio art was in its infancy but that, in 1925, when the patent issued, the art had attained an amazing growth. It is pertinent to inquire what happened to the application during this span of twelve years during which the mysteries that had enveloped the early art were largely dispelled and replaced by a broad knowledge of its principles.

After the application was filed in 1913 it lay practically dormant for several years, the applicant filing enough amendments by additions and cancellations to keep it alive. Amendments to the specification occurred as follows: Two in 1913; eight in 1914; one in 1915; five in 1916; three in 1917; three in 1919 and forty-five in 1925, the year the patent issued.

Amended claims were filed and additions thereto and cancellations thereof made as follows: Four in 1913; fifteen in 1914; twenty in 1916; five in 1917; nine in 1919; five in 1921 and forty-two in 1925, the year of the patent.

Analyzing these amendments, it appears that the five original claims (which were for

process and method) were at different times wholly canceled. Late in the year 1913 Langmuir first made claim to invention of a structure or device, that is, to invention of a tube. This he did by four claims. The first was amended four times and cancelled in 1925. The second also was amended four times and cancelled in 1925. The third was amended four times and was not cancelled. The fourth was amended once and cancelled in 1925. Of the thirty-two claims allowed in the issued patent, four are for method and process, being amplifications of the original method and process claims cancelled; twenty-eight are for a device. Of these device claims one was filed by amendment in 1913; one in 1917; nine in 1919; three in 1921 and fourteen in 1925, the year the patent issued. Bearing on the question whether Langmuir knew and disclosed in 1913, or indeed in succeeding years, what he had invented, it is significant to note that during twelve years, and mainly in the latter part of that period when the art had grown and reached a high stature, he rewrote, by sixty-seven amendments, the major part of his specification and cancelled all the original method and process claims and by one hundred amendments added, changed and cancelled claims until finally he was allowed the thirty-two claims of which twenty-eight, the claims for a device, are entirely new. It would be instructive, yet impossible within the permissible bounds of an opinion, to trace the progressive changes from the method and process claims of the original application to the device claims of the matured patent. But device claims having been allowed, they inevitably bring into the case certain devices of the prior art of which two are presently pertinent.

Long before Langmuir applied for a patent, Fleming, an English inventor, brought into a very feeble art a practical electron discharge device, comprising a cathode and anode in a vacuum tube. Also long before Langmuir's application, De Forest improved on Fleming by producing an electron discharge tube which he described as an oscillation detector and called an "audion." The improvement consisted in adding a grid to Fleming's elements. The construction and functions of both devices are given in an elementary way in the opinion in Westinghouse Electric & Mfg. Co. v. De Forest Radio T. & T. Co. (C. C. A.) 21 F.(2d) 918, 919. The audion as conceived by Fleming and improved by De Forest at once became and has ever since continued to be the basis of the modern art of transmitting sounds great distances both by wire and through the air. Just here dates are important. A patent for the audion (No. 879,932) issued to De Forest in 1908. The audion vacuum tube was therefore in existence and its principles of operation presumably known by Langmuir when in 1913 he filed his application for a method of evacuating such a tube, although he had not seen one until that year. In 1912 or 1913, the American Telephone & Telegraph Company, committed to the operation of transcontinental telephony by the opening of the San Francisco Fair, acquired rights under the De Forest patent and, first exhausting the gas and heightening its vacuum, used the De Forest audion as an amplifying telephone relay, thus making possible the first transmission of vocal words from coast to coast by wire. In 1917 the De Forest Radio Telephone Company, assignee of the De Forest patent, granted (with certain rights reserved) a license to the Western Electric Company to make, use and sell the invention for certain purposes with the right to grant sub-licenses. In 1920 the General Electric Company, the plaintiff in this suit and the assignee of the Langmuir patent in suit, acquired through mesne conveyances a sub-license to make, use and sell the De Forest audion, De Forest Radio T. & T. Co. v. Radio Corporation of America (C. C. A.) 20 F.(2d) 598, 599, 600, which' (probably with a heightened vacuum) it did on a vast scale until the De Forest patent expired in 1925, the year in which the patent in suit, after twelve years of travail in the Patent Office, issued to Langmuir, assignor to the General Electric Company, for an electron discharge tube including the essential parts and now universally accepted principles of the Fleming-De Forest tube. The Langmuir patent now completely covers the field previously occupied by the audion of the expired De Forest patent, and will, on the decree of this court, continue to cover it for twelve years more; hence the importance of this litigation.

Turning to the patent as it issued, the specification must first be looked at, for it contains some references to the behavior of electricity in a vacuum tube, old and well known, which are necessary to an understanding of the case. First there is a description by words and diagrams of mechanism for a vacuum tube. If new, this, it would seem, is unimportant as the specific mechanism is not claimed. Its importance resides in the fact that the patented device comprises the three elements of the general mechanism

found in the art—the cathode, anode and grid, variously positioned in a vacuum tube to get the best electrical result—and in the fact that, as I read the record, these three elements, separately and in combination, operate on the same principle in which they operated in the art. Describing their operation, as the art then knew it, Langmuir said:

"The passage of an electric current across a tube ordinarily involves the movement of negative charges called electrons which, under the influence of the impressed voltage, pass from the cathode to the anode through the vacuous space. If these electrons when moving above a certain velocity collide with gas molecules they tend to ionize the molecules, splitting them up into electrons and larger and more slowly moving ions. Under these circumstances the phenomena of conduction across the tubes are the result of the action and interaction of electrons and the ions; * * * The cathode under these conditions is disintegrated, * * * which causes its rapid destruction. * * * The bombardment of the cathode by positive ions also causes heating of the cathode. The ionization of gases at low pressures by collision with electrons occurs at definitely determinable voltages, these voltages being known as the ionization voltages. * * * (It should, for later use, be noted here that Langmuir said nothing about gas being a supposed medium for conducting electrons from one electrode to the other.)

"If for a given cathode temperature the voltage is sufficiently high to cause all the electrons emitted or liberated at the cathode to be drawn away, then a further increase in voltage produces substantially no change in the current. The current thus determined is called the saturation current, and the range of operation in which the current is substantially independent of the voltage or approaches this condition may be called the saturation range or more briefly designated merely as saturation. If for a given cathode temperature the voltage is not high enough to cause all of the electrons which are emitted or liberated at the cathode to be drawn away, the operation occurs in a range below the saturation range. Operation in this range may be spoken of as operation below saturation."

Predicated on these two definitions of ionization and saturation Langmuir by claim 2, which has been treated in this litigation as a typical claim, said that his invention is:

"A discharge tube having a cathode adapted to emit electrons and an anode adapted to receive said emitted electrons, the tube walls being fashioned or shaped to permit the direct passage of a useful proportion of said electrons from cathode to anode, the gas content or residue of said tube and the relation of the parts of the tube being such that the tube is capable of being so operated in a range below saturation and materially above ionization voltages that the space current is governed or limited by the electric field of said electrons substantially unaffected by positive ionization."

That, as I read it, simply means "high vacuum," for a tube properly fashioned and shaped by skilled workers and highly (thoroughly) evacuated of gases—free and occluded—will in conjunction with a two electron group or with a group of two electrons and a grid produce these results; both groups, then and now, being in common use for different purposes by the art and by the plaintiff itself.

For the purposes of this case, vacuum means gas evacuation, high vacuum means vacuum above the ionization point, and, by the same token, a high vacuum tube means a non-gaseous tube. If the language of the claims means high vacuum, it is prior art, for the art was entirely familiar with the fact and effect of such a vacuum; and if prior art, Langmuir invented nothing.

When the patent came into litigation in this case in the District Court of the United States for the District of Delaware the learned trial judge, having trouble with the claims, endeavored to get from the plaintiff a definition of the invention, asking time and again, as did this court on appeal: If not high vacuum, what is the invention? An answer to this question seemingly had its difficulties. The plaintiff, of course, could not say that the invention was high vacuum alone, or high vacuum in combination with Fleming and De Forest parts alone, for that would be an admission of old art and would instantly avoid the patent. It was forced to admit that the Langmuir device included all these old elements but claimed it included "something else." So, eventually, in order to show this something else—something new—it produced, under the insistence of the trial court, this carefully constructed definition of Langmuir's invention, on which the case was tried below and on which it was first argued and decided in this court on appeal:

"The Langmuir invention is a coordination of elements having a new functional relation between various factors, producing a

new result. It is not a matter merely of maintaining a certain vacuum, far less of *producing* a certain vacuum which will be destroyed the moment the tube begins to operate. It involves primarily a relation between the shape, size and space relation or "geometry" of the parts of the tube and the nature and pressure of the gas therein contained, coordinated and adjusted with respect to the conditions of the electric circuit."

That, I surmise, would be a bad patent claim. However, as it was intended to describe the invention more clearly and more definitely than Langmuir had disclosed it in the patent claims I shall take it as it is written and try to find what it means. I discern in its generalization three factors: (1) Gas pressure in the tube; (2) "shape, size and space relation or geometry of the parts of the tube"; and (3) the relation of one to the other.

The first factor of gas pressure, or, more properly, the lack of it, if it means anything, must mean a minimum of gas. This in turn means high vacuum. If it does not mean high vacuum there is no new vacuum factor of invention in the device, for low vacuum was old and that is an end to the case. If it does mean high vacuum then again it is not new, for high vacua, their uses and effect and how to produce them, were long known and practiced in the art.

The second factor, or "geometry," of the physical tube elements is not, so far as the claims reveal, involved in the invention. The physical elements themselves were old. This the plaintiff admits. Though differing in shape from some others, they are not claimed to be inventively novel in themselves. Indeed, each claim describes the invention not so much by its parts as by its characteristics of operation and results—characteristics inherent in any electron discharge tube possessing a high vacuum. Nor was this an inadvertence for when the Examiner, on rejecting certain device claims on prior art references, said:

"If applicant's device is an improvement over the reference he should define the difference by structural limitations," the applicant (Langmuir) replied by saying:

"The 'structural limitations' in this case are to be found in the *difference of vacuum.*"

So, thus far, the invention, with old parts and a high vacuum, gets back to the question whether there was invention in the "difference" between low vacuum and high vacuum, a difference existing in and known to the art.

The third factor, the relation of the two factors of gas pressure and physical parts, appears nowhere in the claim unless it be implicit in the words "the gas content or residue of said tube and the relation of the *parts* of the tube being such" as to produce a certain result. (Gas pressure is scarcely a *part* of a tube.) If it is so implied, Langmuir cannot claim invention by implication. The claim therefore is void for inadequate disclosure. If it is not so implied, there is no claim for the third factor.

Whether I am right or wrong in this analysis of the plaintiff's statement of Langmuir's invention or in my disposition of its elements is not important for the validity of the patent depends not on the plaintiff's conception and definition of the invention but on the claims of the patent.

So I come back to the claims of the Langmuir patent to find Langmuir's invention. But before doing that I am arrested by still another entirely new definition of Langmuir's invention, this time made by the court in its opinion. The court did not adopt the plaintiff's definition of co-ordinating elements with functional relations but, stating that a non-gaseous electron discharge device did not exist before Langmuir, found the invention to reside in his producing a non-gaseous tube in place of a gaseous tube of the prior art or, in other words, in substituting a high vacuum for a low vacuum, the very thing which all along the plaintiff was forced to avoid in its definition because it was old. Without conceding its predicate, I agree with the court's succinct definition of the invention; but as the invention so defined was old I cannot agree to hold a patent for it valid.

It now appears, and I say this with entire respect, that in interpreting and sustaining the patent broadly for a non-gaseous tube the court has given the plaintiff more than it ever dared to claim. A high vacuum or non-gaseous tube being old, the plaintiff knew that an admission that the invention was a non-gaseous tube and nothing else would defeat the patent. Langmuir also must have known that a non-gaseous tube was old for otherwise, if he had believed he was the first to conceive and make one, he could, and doubtless would, have claimed it in a half dozen words: "A non-gaseous discharge tube," or "an electrical discharge device with a high vacuum tube," whereas in his original application for a patent he made no

claim for a tube of that kind or, indeed, for a tube of any kind, the inevitable inference being that at that time he thought all he had invented was a new method or process of gas evacuation, that is, a new way to produce an old thing. But that the plaintiff realized the necessity of claiming for the invention something more than a high vacuum tube or non-gaseous tube is evidenced by its earnest and repeated contentions that Langmuir's invention, while including a non-gaseous tube—high vacuum—admittedly old, included "something else," that something else being disclosed by the remainder of the long claims and interpreted in its quoted definition. The plaintiff nowhere and at no time has claimed that Langmuir invented a non-gaseous tube per se. And wisely so, for it well knew that, while not in universal use, non-gaseous tubes were in commercial use before Langmuir for some purposes and that gas evacuations were as thorough as the instrumentalities of the art in 1913 would effect, and that was substantially above the ionization point, which is the crux of this case.

Returning to the patent claims and using claim 2 for convenience, it appears that the invention is an electron discharge tube which is capable of being operated below saturation and above ionization voltages. Langmuir called this a "pure electron discharge device" —"pure" because unaffected by gas ionization which is either entirely absent or negligible.

Electricity is an elusive subject. Therefore I shall, for the immediate purpose, restate in plain words, if I can, the theory of ionization.

Ionization is an effect produced by passing an electric current through gas which remains in a vacuum tube when it has not been thoroughly evacuated. The myriads of electrons, when passing from cathode to anode above a certain velocity, collide with and break up the molecules of gas present and charge the resultant broken parts or ions with positive charges of electricity. Thus electric reaction is inevitable. The ions (with their positive charges of electricity) fight against the electrons (with their negative charges) in the normal flow of the latter from cathode to anode resulting, at high voltages, in a blue glow which is the indication of bad action, a thing to be avoided. The central point of this statement is that ionization occurs at certain voltages in an electron discharge tube when, not being thoroughly evacuated, it contains air or gas, whether gas free

in the tube or gas occluded in its parts and liberated by heat during operation. The amount of ionization depends upon the amount of gas present. Langmuir prescribed in his specification that occluded gas should be expelled from the tube parts; from the tube by heating its glass walls; from the cold electrodes by electron bombardment—the liberation of gas by the electric discharge itself; and from the incandescent cathode by the heat of an electric current; all old; and after this, that both the expelled gas and free gas should be pumped out of the tube during the heating process (old) by "a suitable evacuating means (old) for example, a Gaede molecular pump," then a new German invention.

Thus the capital requirement, if not the sole requirement, of Langmuir's claimed invention, is as nearly as possible to withdraw from the tube all gas, free and occluded; in other words, to obtain as high a vacuum as possible. When that is done ionization is avoided and a pure electron discharge follows. Was this new with Langmuir?

Langmuir was met in the Patent Office with the Law Examiner's statement that:

"It is apparent after a review of the record that there is no single element which is broadly novel in the assemblage of elements making up an electron discharge device of the character defined in the issue. *An evacuated tube having therein an incandescent electron emitting cathode and an anode was old prior to the filing of Langmuir's application, and methods of attaining high vacua, sufficient to give a relatively pure electron discharge in a properly designed tube were also well known and available to persons skilled in the art.*"

Was that statement of the Law Examiner correct? I think it was. Just here occurs my sharpest departure from the opinion of the court which is based, as I have before stated, on what I am constrained to believe is an erroneous theory or finding that all discharge tubes before Langmuir were gaseous and that Langmuir's invention is a non-gaseous tube.

If that was his invention, clearly he must have been the first to conceive it and reduce it to practice. That the Examiner was right in saying that high vacua in electron discharge tubes were old before Langmuir and that a pure electron discharge—the inevitable result in a high vacuum non-gaseous tube and an impossible result in a gaseous low vacuum tube—also was old is sustained by many prior

publications and patents. The same prior publications and patents contradict, I think, the court's holding that Langmuir was first to make and invent a non-gaseous tube. They are so numerous that it would not be permissible to quote them in an opinion. I shall therefore do nothing more than cite a few of them, ranging from 1881 to 1912, found in the record and to be used by anyone who should desire to check up this statement or who may be charged with the duty of retrying the issue. They are: Lilienfeld, Fleming, Doane, Von Baeyer, Bissel & Hagen, Malignani, Edison, Dwyer, Duncan, Leonard, Soddy, Thatcher, Child; illumined by the testimony of Waterman and Chaffee.

On these references I stand; and on them I would hold the patent invalid for want of invention.

Passing from the literature and patents of the prior art as affecting the validity of the patent for want of invention, I come to the question of prior use. The trial court found the patent also invalid because of prior use by De Forest on evidence as to which there is little dispute on the facts as distinguished from inferences. The test is the voltage at which ionization ordinarily occurs in a "gassy" tube. It is given at from 20 to 30 volts. That is not disputed; they are Langmuir's figures.

Prior to August 1912, De Forest was the electrical engineer of the Federal Telegraph Company of California and was engaged in developing the transmission and reception of messages by radio. In this work he used his oscillation detector or audion then normally having a gas content. It was a "gassy" tube. But desiring to use it not as a detector but as an amplifier, as later it was almost universally used and indeed as made for that use by the plaintiff itself under license and by the Westinghouse Electric & Manufacturing Company, its sub-licensee, he had the audion exhausted of gas as far as it was possible in that day. That is, he sought and obtained as high a vacuum in the tube as existing means would produce. When the vacua were too low and the amplifications poor he complained to the manufacturer and had the tubes re-exhausted. During that period (1910, 1911 and 1912) the Federal Telegraph Company used De Forest's amplifying audion at 54 and 67½ volts. This was possible only because he had exhausted the tubes of gas, which otherwise would produce ionization at 20 to 30 volts, and thereby heightened the vacuum above that danger line. This

was "high vacuum" within the definition of vacuum above the point of ionization and was therefore high vacuum within the sense of those words as used in this case. It was not so high as that later attained by more modern means, for instance the Gaede molecular pump, which had just come into the art at the time of the patent application, referred to by Langmuir in his application and invented not by him but by Gaede. I agree with the court that De Forest did not then understand the change in operative principle for in later years he expressed views contrary to those advanced both before and after that time. But De Forest did change the vacua of his tubes in changing their function from detectors to amplifiers. Whether he knew the principle of the change is of no consequence. The fact is he did it. And he did it before Langmuir. And by doing it he got rid of the ionization of low vacuum and obtained, and put into commercial practice for nearly three years before Langmuir, the very electron discharge of Langmuir's claimed invention.

What I have said about the device claims applies equally to the method and process claims.

On the subject of validity as involving invention I shall conclude this phase of the discussion by referring very briefly to the claimed advance made in the art by Langmuir's invention, matter with which the plaintiff very earnestly began and ended discussion in its brief and at the argument and matter by which the court was impressed. Admittedly, when invention is in doubt—yet *only* when it is in doubt—favorable reception by the art may be placed in the scale. As the four judges who heard this case have divided evenly on the question of invention, I shall, for that reason only, assume there is doubt as to invention. The plaintiff says that today everybody uses "the Langmuir tube," a name given it not by the art (as the plaintiff frankly admitted at the argument) but by the plaintiff itself; that Langmuir, seeing through the mysteries of the art, made an invention that revolutionized the industry and made possible the transmission of sounds through the air for great distances which without his invention would be impossible.

Much litigation in respect to the radio art has drifted to this circuit. Oddly enough, in every case the plaintiff has claimed for his invention the whole credit for its growth. I am satisfied from the number of cases we have heard that the whole credit for the amazing advance of the radio art cannot be

given to any one invention or even to a few of them. In truth, the art is the product of innumerable impulses. The original impulse was, of course, the vacuum tube appearing years ago in the incandescent lamp art. Another impulse given in the incandescent lamp art and transferred to the radio art was that of the Just and Hanaman unstable squirted tungsten filament displacing Edison's bamboo filament; still another was Coolidge's method for obtaining a filament of pure tungsten, strong and stable. Impulses in the radio art itself came from many inventors. At one time there were seven thousand applications for patents pending in the radio section of the Patent Office. To mention only one or two inventions, they include discharge devices of the Fleming two electrode type and the De Forest type with a grid added to Fleming, the feedback circuit invented at different times by De Forest, Armstrong, Langmuir and Meissner. There are many more, without any one of which it has always been said by the particular inventor that the art would have gotten nowhere. And now the plaintiff here says the same of Langmuir. Important and indeed great as some of these inventions were, no one of them is entitled to all credit for what has been accomplished in this great art, for the art has been impelled forward by hundreds of inventors and thousands of skilled workers. What Langmuir claims to have done—procured pure electron discharge above ionization voltages in tubes of the De Forest type—appears to me to be the natural growth of the art, begun by others before Langmuir and by them reduced to practice with means then available, and developed to their later perfection during the twelve years of his patent prosecution through the Patent Office.

I thought after the argument, and still think, the Langmuir patent invalid because of lack of invention and prior use. If I am wrong and the patent really involves invention, then, again, I think it invalid for, as I read the evidence, Langmuir was not the first and original inventor. On this point, to avoid repetition, I refer and subscribe to the opinion of Judge Morris holding on evidence substantially greater than the evidence in the interference proceeding that, if invention, Arnold was the first and original inventor.

And so this court, one judge dissenting, affirmed the decree of the District Court, on its opinion, holding the Langmuir patent invalid.

In due course the plaintiff filed a petition for rehearing based on this proposition:

"In simple language, Langmuir's invention consisted in taking out the conductor (gas) which was in the Fleming valve and the De Forest audion and putting nothing in its place; he dispensed with what was regarded as an essential element in the operation of the tube (gas) and by doing so made a tube which worked infinitely better."

The petition was allowed and the reargument was based on this entirely new statement of Langmuir's invention made for the first time four years after suit was brought, five years after the patent was issued and seventeen years after the application was filed. Of course if the facts asserted were facts established by the evidence there would be no doubt about what Langmuir did and no doubt that it was invention and, if claimed, no doubt he was entitled to a patent.

The plaintiff rests its proposition upon its own statement that "Both Fleming and De Forest depended upon the conductivity of gas as the fundamental basis of the operation of their tubes." It makes this statement without distinguishing between detectors and amplifiers and supports it by carefully selected quotations from scientific publications in the early days of the art ranging from 1905 to 1912 (one in 1915) when scientists were feeling for the theory of electron movement in electron discharge tubes, some of whom based it on conduction by rarified gases or air, some on conduction by ionized gases, and some not on conduction at all but on free passage of electrons through space in a high vacuum, that is, in the absence of gas or air. And in addition the plaintiff to support its statement points to an adverse criticism by De Forest in 1915 of Langmuir's "extremely high vacuum" quoted in the court's opinion. The plaintiff ignored all the testimony on the subjects of prior art high vacua and pure electron discharge, which means absence of gas as a conductor, their advantages and uses, to which I have previously alluded with citations.

Of course, if the belief and practice of the art were that gas conducts the electrons, that gas therefore is necessary to conduction and Langmuir discovered it to be wrong, that in fact gas is an enemy to conduction, and omitted gas as an element in his tube yet obtained the same or a better result, clearly he made an invention. These are the things which now the plaintiff and also the court say he did. But Langmuir did not say so. If that was his invention he should have disclosed it in his claims for we are called upon to judge the patent on Langmuir's disclosures, not on the

plaintiff's definitions of his invention. To be sure, he did refer in his specification to several tubes—the Geissler tube and the Roentgen X-Ray tube—"whose operation depends upon gas ionization." He might, more or less correctly, have added to the list detectors with gas content, then and now in common use for certain purposes, whose usefulness depends on their sensitiveness and their sensitiveness on gas content. But he nowhere said in his patent that before his invention electron discharge tubes used for amplifying purposes in order more faithfully to reproduce sounds (one of the purposes of the De Forest audion and the thing we are dealing with in this case) depended on low vacuum or that the art regarded, as an essential element of such a device, gas as a conductor, for he probably knew the contrary was true. To show that the plaintiff's last definition of Langmuir's invention is without foundation in the evidence I refer to, but shall not repeat, what I have said about prior knowledge and prior use of high vacuum tubes. I shall endeavor, very briefly, to show that Langmuir by his own words contradicts the plaintiff's last definition of his invention and refutes the theory on which the court has in part based its judgment.

In Langmuir's original specification he stated that when there was enough gas in the tube to become ionized by the discharge of electrons "The positive ions (gas molecules) *take part* in the *conduction* of current, giving at first erratic readings on measuring instruments connected in circuit," which is what the plaintiff now says. Continuing, he said, that the audion, the De Forest tube, was a device that took advantage of that phenomenon. *But he cancelled the quoted statement before the patent issued.* At the trial he was examined with respect to that statement in his patent application and was asked whether the sentence would be true if it read: "The positive ions take part in the conduction of current by acting as *conductors* or carriers of current." He answered: "In my opinion the sentence would have *no sensible meaning* if the word 'conductor' was left in for *it is inconceivable that ions could be conductors of current.* I will, therefore, confine myself to the case where the positive ions act as 'carriers.' With this correction I can say that the statement would not have been true."

With this cancellation and explanation Langmuir rested. Neither by amendment nor in his testimony did he again advert to a prior art theory of gas conduction which the plaintiff now says "was regarded (by the art) as an essential element of the operation."

In the interference proceeding Langmuir testified with respect to the early work of Lilienfeld, as follows:

"Lilienfeld proved beyond question, I think, that he obtained discharges, in some cases at least, in which the effects that he measured *were not dependent upon gas ionization.* ·* * *

"Lilienfeld probably succeeded in obtaining a discharge *high vacuum substantially free from effects of positive ionization* in the device he described in his 1910 paper. * * *

"Lilienfeld in his experiments of 1910 heated the walls of the vessel, *he reduces the gas pressure to a low value,* and in some of his experiments *he heated his electrodes* by *electronic bombardment.* * * *

"*Heating of glass and electrodes, and exhaustion to low pressure,* are elements which were used by Lilienfeld and were known *prior* to Lilienfeld's article. * * *

"Factor No. 1 which I gave in answer to XQ84, viz., that the bulb should be heated *during* exhaust to a temperature materially higher than the operating temperature, was used by Lilienfeld in much of his work. * * *

"Factor No. 4, which is that which I gave in the first part of my answer to XQ87, refers to the lowering of the pressure to such a point *that a further lowering brings about no further change.* In many of Lilienfeld's experiments, this condition *was realized.*"

Von Baeyer stated as early as 1909 that his "experiments were of course carried out in the highest possible vacuum to avoid the influence of ionization." Langmuir admitted that "Wehnelt claimed that * * * currents of the order of 10 milliamperes could be obtained even in the highest vacuum."

Referring to an interview with Richardson in 1912 Langmuir said:

"Richardson * * * expressed himself as confident that even in the highest vacuum thermionic currents could still be obtained."

Langmuir admitted in the interference proceeding that "prior to 1912 (the year before his application) there were some experimenters who took precautions to remove gases from the walls, from vessels and from electrodes."

This, I think, shows that the reargument, based on an incorrect premise, should leave undisturbed the court's first finding that the patent is invalid.

· The plaintiff, however, prevailed. The court reversed its previous decision and will now enter a decree holding the patent valid. From the opinion announcing its judgment, in so far as it will reverse the decree of the District Court on the first (Langmuir) patent in suit, I dissent.

This is a long dissenting opinion. In view of the gravity of the court's decision and its effect upon the art I make no apology for its length. I frankly admit that it is written with the hope that it will arrest the attention of the reviewing court.